[Civ. No. 4906. Fifth Dist. Jan. 22, 1982.]

DAVID GODFREY et al., Plaintiffs and Appellants, v.
IRWIN STEINPRESS, Defendant and Appellant.

156

COUNSEL

Badger, Mower & Wiegand, Badger, Mower & Dunford and Carlos J. Badger for Plaintiffs and Appellants.

Haight & Harriman, Haight & Reed and Gerald A. W. Haight for Defendant and Appellant.

OPINION

STONE (C. V.), J.*—

### STATEMENT OF THE CASE

On August 2, 1977, plaintiffs and appellants, David and Debra Godfrey, filed a complaint in the Superior Court of Stanislaus County,

---

*Assigned by the Chairperson of the Judicial Council.

naming as defendants Joseph and Barbara Giannobile, Jack Heaton, doing business as Heaton Pest Control, Irwin Steinpress, doing business as Steinpress Realty & Development, and Great Western Savings and Loan Association. On January 25, 1979, Stanislaus Title Guaranty Company was added as an additional defendant.

The complaint alleged causes of action for fraud, negligent misrepresentation, breach of fiduciary duties and emotional distress. Specifically, the complaint alleged that defendant and appellant Irwin Steinpress, doing business as Steinpress Realty & Development, on or about November 4, 1976, fraudulently represented to both plaintiffs "that the items showing defects in the November 4, 1976 pest control report could be corrected for an expenditure of $946.00 and stated to plaintiffs that when these repairs had been made said house would be in good condition, free of termites, dry rot and other infestations, and that they should not withdraw from the sales agreement because said property was worth much more than the price of $36,500.00." The Godfreys alleged that the representations made by Steinpress were, in fact, false and that the house (that they bought) was, in fact, infested throughout with termites, fungus and dry rot. The Godfreys added causes of action for intentional and negligent infliction of emotional distress. In both the fraud and emotional distress causes of action, the Godfreys asked for punitive damages.

During the jury trial, the Godfreys dismissed all of the defendants except for appellant Steinpress. Prior to trial, the Godfreys had dismissed Great Western Savings and Loan.

At the close of trial, the court granted Godfreys' motion to amend the complaint so as to conform to proof and to set forth a cause of action for fraud by concealment.

On March 16, 1979, the jury returned a verdict and special findings. In a nine-to-three decision, the jurors found defendant Steinpress intentionally concealed a material fact with the intent to defraud, causing $1,800 in damages. The jury also found that defendant Steinpress intentionally inflicted emotional distress, causing each of the Godfreys $10,000 in damages. For the fraud and emotional distress the Godfreys received punitive damages—$30,000 each.

Irwin Steinpress appeals from the entire judgment. The Godfreys appeal from that portion of the judgment awarding $1,800 in damages.

## FACTS

The factual background preceding the filing of this action and the necessary references to the pretrial and trial records are not particularly complicated but are extensive. To avoid repetition, we will give a skeleton outline of the facts and flesh in that framework when we refer to the issues on appeal.

In July 1976, Joseph and Barbara Giannobile listed their 30-year-old farm house and acreage for sale with Irwin Steinpress Realty. The price for the house and two acres was $31,950. The house was described in the listing as being in "good" condition and "Comfortable country home needs some fixing up."

Debra and David Godfrey, after a brief visit to the Giannobile property, contacted Steinpress Realty. Jannie Kenney, a salesperson for Steinpress Realty, went to the Godfrey home in response to their call. David Godfrey was shown the listing by Kenney and there was some discussion regarding the necessity of a termite report. The Godfreys made an offer of $40,000 for the house and five acres, which was eventually reduced to $36,500, the appraised value, and accepted by the Giannobiles.

The Godfreys made arrangements for financing with Great Western Savings and Loan Association. Great Western's instructions to the escrow company, Stanislaus Title Guaranty Company, included the provision, "A termite report is required. The report must be signed and acknowledged by the borrowers and delivered to us prior to funding. If the required work is over $600.00 we will also require a copy of the completion, signed and acknowledged by the borrowers, be delivered to us prior to funding." Irwin Steinpress was aware that Great Western would not allow escrow to close and disburse the funding until all required work called for in the termite report in excess of $600 had been completed.

Steinpress Realty hired Heaton Pest Control to do the termite inspection. Heaton made an inspection on November 4, 1976, and submitted a report stating there was a "faulty grade level" and fungi damage. There was no mention of termites. There was a recommendation for a further inspection. The total cost of the report and recommended repairs was $971.

Irwin Steinpress and his sales manager, Ron Eneboe, asked Jack Heaton of Heaton Pest Control to do just enough work on the house to get the estimate below $600 so Great Western would approve dispersal of the loan. Heaton refused to do this and Steinpress instructed Eneboe to obtain another report. Eneboe hired Clark Pest Control for this purpose. On November 12, 1976, Ron Fair, the manager of Clark Pest Control, inspected the property. Fair found that the house was on a concrete slab, except for the hallway and bathroom, which he believed to be wood installed over earth, causing earth contact and subterranean termites. He also found evidence of subterranean termites in the attic and that fungus and dry rot had infected and damaged portions of the structure. Fair set the cost of repairs at $1,155.

A copy of the Clark Pest Control report was sent to Steinpress and the Giannobiles. Steinpress discussed the Clark report with Mr. Giannobile and told him he was not going to use it. Neither Giannobile nor Steinpress nor any of the Steinpress employees told the Godfreys about the Clark report. Ron Eneboe discussed the Heaton report with the Godfreys on November 16. It was agreed that Steinpress Realty would pay the cost of cutting out fungi damaged wood and replacing it. Eneboe told the Godfreys that with these repairs the house would be in good shape.

Escrow closed November 24, 1976. The Godfreys moved in on November 25. After a few days, David discovered dry rot in an interior partition. He also found there was no floor in the bathroom, just carpet covering dirt. Termites were discovered in the bathroom, hallway and in front of the bathroom.

In early February 1977, Debra Godfrey moved out of the house. She could not take the dirt floor, the smell, the termite problem and was tired of not having a completed house. She had trouble sleeping until she moved out. After termites were discovered, she was upset, depressed all the time, and it seemed like she was always crying. They also argued more frequently after the termites were found. She also had headaches more often. Debra blamed her husband for their being in the house. From November to February, she described her marital relations as "cut down to nothing . . . I couldn't have cared what [David] did."

While living in the house, David was very unhappy and he felt like he had been cheated. When they found out what kind of shape the house was in and after discovery of the termites, their marital life began to

deteriorate. Debra was always upset and crying and blaming him for the mess. During the three months they lived there, they argued a lot and their sex life was almost "nil." As a result, David became very depressed and started drinking and they argued.

Three weeks after Debra moved out, David joined her at Debra's parents' house. He moved out because of the general condition of the house—the wiring was bad (which was visible when he first saw the house), the bathroom stank, the smell could not be covered up, the toilet was not anchored, the bathtub was sinking down and the paint flaked off.

David continued drinking almost every day after moving in with his wife. A couple of times he called "Self Help" about his "anxiety attacks," which he described as an "utter state of confusion."

### MOTION FOR JUDGMENT ON THE PLEADINGS

On November 1, 1978, a pretrial conference order was filed with the court setting forth the issues as follows:

"1. Negligent misrepresentations of fact, if any, by defendants;

"2. Intentional and fraudulent misrepresentations, if any, by defendants;

"3. Justifiable reliance by plaintiffs;

"4. Intent to inflict emotional distress;

"5. Negligent infliction of emotional distress;

"6. General and special damages, if any;

"7. Reckless or malicious conduct justifying punitive damages;

"8. The amount, if any, of punitive damages to which plaintiffs are entitled;

"9. Whether plaintiffs failed to mitigate their damages; and

"10. Plaintiffs' contributory negligence (if available as a defense)."

■ On March 12, 1976, the first day of trial, Steinpress made a motion for judgment on the pleadings, indicating that the complaint failed to state a cause of action for misrepresentation for two reasons: (1) there was no allegation of truth; (2) the representations were not actionable. He argued that the mental distress causes of action were insufficient because of lack of physical contact or lack of sufficient outrageous conduct and made a further contention that mental distress is not actionable in actions for fraud in the sale of real property. The trial court correctly denied the motion.

Whether the pleadings were sufficient to state a cause of action is not an issue. The pretrial conference order precludes an attack on the pleadings. (*Fitzsimmons* v. *Jones* (1960) 179 Cal.App.2d 5, 10 [3 Cal. Rptr. 373]; Cal. Rules of Court, rule 216.[1] "[¶] More particularly, a party may not raise inadequacies in a pleading after the issues have been determined by a pretrial court." (*Bilardi Constr., Inc.* v. *Spencer* (1970) 6 Cal.App.3d 771, 785 [86 Cal.Rptr. 406]; see also 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 67, p. 2903.)

In any event, we find the issues as set forth in the pretrial conference order sufficient to withstand Steinpress' attack on the pleadings,

### MOTIONS IN LIMINE

■ After the trial court denied the motion for judgment on the pleadings, Steinpress moved to limit the introduction of any evidence regarding loss of consortium and/or evidence regarding mental or emotional distress on the grounds that such "damages are not recoverable in a suit such as this." Steinpress now contends that the trial court erred in denying the motion and that the Godfreys should not have been able to recover for loss of consortium, as both spouses were suing for infliction of emotional distress and part of the mental stress that each spouse suffered was a loss of conjugal rights; thus, a double recovery. Steinpress cites *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669]. *Rodriguez* does not support Steinpress' contentions. In that case, the court specifically rejected the argument of

---

[1]California Rules of Court, rule 216 reads as follows: "When filed, the pretrial conference order becomes a part of the record in the ease and, where inconsistent with the pleadings, controls the subsequent course of the case unless modified at or before trial to prevent manifest injustice. Any motion so to modify before trial shall be heard by the pretrial conference judge or, if not available, before the presiding judge or, if none, before any judge sitting in that court."

double recovery. (*Id.*, at pp. 404-406.) It should also be noted that the jury was not instructed on loss of consortium as a separate theory of recovery and on the special verdict form the jury was not asked to award separate damages for loss of consortium.

Steinpress further moved to limit the introduction of evidence to the allegations in the complaint on the issues of fraud. (In effect, this would limit the broad effect of the pretrial order.) In response to that motion, the following discussion occurred between the court and counsel:

"[COUNSEL FOR GODFREYS]: Your Honor, I would say that we are intending to introduce evidence of misrepresentation. I would say that the pre-trial order supersedes and I think opened up all these areas.

"THE COURT: All what areas?

"[COUNSEL FOR GODFREYS]: I think it opens up the fraud area as far as this particular—

"THE COURT: What? What? Because they said intentional and fraudulent misrepresentations, if any, by defendant? So you can introduce anything on that? Is that what your position is, because it was stated generally?

"[COUNSEL FOR GODFREYS]: Yes, your Honor.

"THE COURT: How about the contentions of the parties, the pleadings, and pre-trial statements filed herein set forth the factual and legal contentions? Doesn't that limit you?

"[COUNSEL FOR GODFREYS]: Your Honor, I would—your Honor, it has been known, it has been expected by all parties that with reference to a particular pest control report, has come out in every deposition, every party knows and every party is aware that that is to be introduced into evidence and that that is the basis of the fraud.

"THE COURT: Well, what? Don't follow you. You're so vague. You, coupled with [counsel for Steinpress] comments, are so vague, it's pretty difficult to follow what you're talking about.

"If it comes within the scope of what you allege the fraud to be, there's no problem. Does it?

"[COUNSEL FOR GODFREYS]: I think it does. And it is part of a continuing course of conduct.

"[COUNSEL FOR STEINPRESS]: Your Honor, then we would offer to stipulate that they can produce any evidence pursuant to the specific allegations they've got in their case.

"[THE COURT]: Well, you don't have to stipulate to that, Counsel. Not giving him anything on that.

"[COUNSEL FOR STEINPRESS]: They say it's within their specific allegations. Then they should have no objection to making that stipulation. If they object to making that stipulation—

"[THE COURT]: All right. Anything else, [counsel for Steinpress]?

"[COUNSEL FOR STEINPRESS]: No, your Honor.

"[THE COURT]: All right. You make your objections as they arise during the course of the trial. I'm not going to make any pre-trial determination on this."

Steinpress urges that fraud must be pleaded with particularity; that he was prejudiced by the wide discrepancy between the pleadings and the proof at trial.

Regarding the fraud allegations, it is the general rule that fraud should be strictly pled, although Witkin maintains that liberal construction of the fraud pleading is as much a duty of the court as in other cases. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 574-575, pp. 2211-2213; cf. *Hayutin* v. *Weintraub* (1962) 207 Cal.App.2d 497, 506 [24 Cal.Rptr. 761].)

■ Pretrial conference orders may be amended in the furtherance of justice and upon such terms as may be proper at any time before or after commencement of trial. (Code Civ. Proc., § 576.) The same rules on amendments of pleadings apply to amendments of pretrial conference orders and the inquiry is whether the trial court abused its discretion in ruling on the amendment. (See *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278, 292-293 [136 Cal.Rptr. 603].)

In spite of the general rule regarding strict pleading, the trial court was controlled by the pretrial order. We, of course, do not know why Steinpress waited until the opening day of trial to attempt to pursue his motion to modify an order, but are not persuaded that his belated efforts *in limine* and the court's ruling caused prejudice. The motion to amend the pretrial order should have first been presented to the pretrial judge who framed the issues. (Cal. Rules of Court, rule 216.) He, presumably, was more familiar with the case than the trial judge at that point. The trial court did not deny the motion but took a "wait and see" approach. Nothing in the record refutes the Godfreys' attorney's statement at the in-chambers conference and in their brief that Steinpress was fully apprised that the Godfreys expected to introduce the Clark Pest Control report. This does not appear to be a case in which a plaintiff sought to introduce a whole new set of fraud allegations at the eleventh hour which could cause substantial prejudice to the defendant. (Cf. *Hayutin* v. *Weintraub, supra*, 207 Cal.App.2d 497, 507-509.)

We do not find an abuse of discretion by the trial court in failing to grant Steinpress' motions.

### ADMISSIBILITY OF EVIDENCE

Steinpress next contends that the court erred in admitting evidence of loss of consortium (double recovery) and evidence of the Clark Pest Control report and its nondisclosure (irrelevant) as beyond the scope of the fraud allegations in the pleadings.

We have already disposed of the loss of consortium issue and need not discuss that further.

To assess the relevancy of the Clark report, we again look to the pretrial conference order and find it sufficiently broad in framing the issues to allow the admissibility of the evidence.

Relevant evidence is defined in part as evidence which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the ... action." (Evid. Code, § 210.)

Even if we ignore the pretrial conference order and look to the complaint, the evidence would still be relevant and admissible. The Clark

report demonstrated that the representation that the house would be in good condition after the corrections provided for in the Heaton report was, in fact, false. The Clark report indicated that the house was in much worse shape than the November 4, 1976, Heaton Pest Control report indicated. Furthermore, Steinpress is relying on over-technical rules of pleading to defeat the Godfreys' recovery. Although there was no allegation of concealment of the Clark Pest Control report or mention of it in the pleadings, we believe it was relevant as it went to the entire transaction of Steinpress selling a house which he knew was infested with termites.

We find that the report was relevant and admissible.

### NONSUIT

Steinpress made a motion for nonsuit at the end of the Godfreys' case which was properly denied. Steinpress argues that "[¶] The only logical inference from the total lack of evidence concerning misrepresentations and intent and reliance is that such does not exist . . . ." He also argues that his conduct could only be characterized as negligent at best; thus, the nonsuit should have been granted to the mental distress cause of action.

■ We review the denial of the motion by the established rule: "A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff." (*Reynolds* v. *Willson* (1958) 51 Cal. 2d 94, 99 [331 P.2d 48]; *Stanford* v. *City of Ontario* (1972) 6 Cal.3d 870, 874, fn. 1 [101 Cal.Rptr. 97, 495 P.2d 425].)

■ We conclude that there was substantial evidence to support a verdict in favor of the plaintiffs and we will discuss this evidence, along with another issue raised on appeal, whether the court erred in allowing the Godfreys to amend to conform to proof so as to argue a cause of action for fraud by concealment.

The Godfreys' evidence may be summarized as follows: The Giannobiles told the Godfreys, "It had been a good little house." The listing

described it as "good." All parties were aware the cost of repairs must be kept below $600 to get the funding from Great Western. All parties were aware of the contents of the Heaton report and cost of repairs contained therein. Steinpress and his employee attempted to get Heaton to do part of the work so as to get the costs below $600. Eneboe hired Clark Pest Control and a copy of that report went to Stanislaus Title Guaranty Company and the Giannobiles. Steinpress told Giannobile that he had read the Clark report "twice already and all through it. And I'm not going to use it." Giannobile testified he "most certainly did" tell Steinpress there were termites in the house. Nobody told the Godfreys about the termites or the Clark report. Eneboe told the Godfreys that the house would be in good shape with some relatively minor repairs. The Clark report was not found with the escrow instructions. The house was not as represented and, in fact, was in such deplorable condition that the cost of repairs would exceed the value of the house. It appears obvious from Mrs. Godfrey's testimony that if the Godfreys had known of the Clark report they would not have gone through with the purchase. Both Steinpress and Mrs. Godfrey testified that Steinpress was representing the Godfreys in the purchase of the property. David Godfrey testified that throughout the entire transaction he relied on Steinpress or his employees. The evidence of fraud was substantial and sufficient to withstand a nonsuit.

■ Regarding emotional distress, the trial court initially determines whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Where reasonable men can differ, the jury determines whether the conduct has been extreme and outrageous to result in liability. Otherwise stated, the court determines whether severe emotional distress can be found; the jury determines whether on the evidence it has, in fact, existed. (*Fuentes* v. *Perez* (1977) 66 Cal.App.3d 163, 172 [136 Cal.Rptr. 275].) "The elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. [Citations.] 'Whether treated as an element of the prima facie case or as a matter of defense, it must also appear that the defendants' conduct was unprivileged.' [Citations.] Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community."

(*Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal. Rptr. 198, 595 P.2d 975].)

 We find that the actions of Steinpress, as discussed above, provided sufficient evidence of outrageous conduct to withstand a nonsuit.

### MOTION TO AMEND

At the end of trial, the court granted Godfreys' motion to amend to conform to proof and to set forth a cause of action for fraud by concealment. Steinpress' counsel was asked whether he had any objection to the amendment and he replied as follows: "[S]ince all I can state, that since this matter was just raised in chambers less than an hour ago, during the time I've had to consider it, the only prejudice I can state off the top of my mind is the fact that in preparing for this trial, including my preliminary work on the closing and opening statement geared such and in asking questions of the witnesses I had oriented myself in terms of determining what negligence or intentional things had occurred with regard to the representations in the complaint rather than any intentional hiding of the second termite report. As I sit here, I cannot think of exactly how I would have changed any of those questions. All I can say is I oriented myself toward that point."

Steinpress now contends that generally a plaintiff may not sue on one theory and recover upon another (*Hathaway* v. *Siskiyou etc. School Dist.* (1944) 66 Cal.App.2d 103, 110 [151 P.2d 161]) and where a defendant is misled so as to be unable properly to combat charges of plaintiff, variance between proof and pleadings is fatal to the right of recovery. (*Gallwey* v. *Castelhun* (1917) 35 Cal.App. 589, 591 [170 P. 657].)

 A motion to amend is a matter placed within the sound discretion of the trial judge and his exercise thereof will not be disturbed on appeal absent a showing that there has been an abuse of discretion. (*Rocky Mountain Export Co.* v. *Colquitt* (1960) 179 Cal.App.2d 204, 207 [3 Cal.Rptr. 512]; see also *Campagna* v. *Market St. Ry. Co.* (1944) 24 Cal.2d 304, 308 [149 P.2d 281].)

 We find no abuse of discretion. The trial court's comments are illuminating and rebut the claim of prejudice. "As the court has viewed

it, the evidence that came in, came in under the pleadings of the complaint as they are, having alleged fraud, and intentional fraud, negligent fraud, and misrepresentation—correction—and intentional infliction of emotional distress. And the evidence came in under the pleading as it was stated.... As I viewed it, I could not see how there would have been anything else done. All the facts that came out in the trial, I'm confident counsel were aware of.... [¶] The plaintiff alleges concealment from him of the termite report. The defendant has admitted that he didn't inform him of that report and stated why he did not. I don't know what else would have been presented if the court had—if you had gone into it with that theory of concealment expressly stated. [¶] That's why I asked counsel if there would be anything any differently done. And nothing I can see of. Because it would have all come in in any event, which it did, even with your understanding of the case that it was on intentional misrepresentation and negligent misrepresentation.... [¶] So the Court cannot see how there would be any prejudice. It seems that the interest of the plaintiffs and having their case presented to the court is served by granting the amendment so they can properly have their case presented. The defendant has objected to that. But I see no prejudice to him because I can't conceive of how his case would be presented any differently. Unless he was going to change his testimony.... He didn't feel that since he was paying for the termite inspection, termite damage, that since he was going to bear the burden of it, that he had no obligation to disclose it."

FAILURE TO AMEND

After the trial court granted the motion to amend, counsel failed to make a written amendment to the complaint. Steinpress contends that this failure constituted an abandonment of the motion, in spite of the fact that concealment was apparently argued to the jury, the court instructed on that issue and, eventually, concealment was the basis of part of the jury's verdict. We find this contention to be without merit and contrary to case law. (*Benton* v. *Hofmann Plastering Co.* (1962) 207 Cal.App.2d 61, 71 [24 Cal.Rptr. 268].)

█ If leave has been given to amend and plaintiff has failed to avail himself of the opportunity, the court, on appeal, should consider the case just as if the amendment had been made. (*Myers* v. *Stephens* (1965) 233 Cal.App.2d 104, 124 [43 Cal.Rptr. 420].)

## CONTRIBUTORY NEGLIGENCE

Steinpress requested the trial court to give BAJI Nos. 3.50 and 14.90 on finding contributory negligence and reduction of damages because of contributory negligence. The court refused the instructions. Steinpress urges there were two possible negligent torts involved: (1) negligent infliction of emotional distress and (2) the concealment which, lacking the actual pleading, may or may not be based on negligence.

In testing the propriety of the court's refusal to instruct, the reviewing court must view the evidence and all inferences that may be drawn therefrom in the light most favorable to the claiming party. (*Bonebrake* v. *McCormick* (1950) 35 Cal.2d 16, 19 [215 P.2d 728]; *Middlesex Insurance Co.* v. *Mann* (1981) 124 Cal.App.3d 558, 567 [177 Cal.Rptr. 495].)

Steinpress cites no authority supporting his theory of contributory negligence as a defense to damages for infliction of emotional distress or fraud by concealment.

We find *Carroll* v. *Gava* (1979) 98 Cal.App.3d 892 [159 Cal.Rptr. 778] persuasive on limiting contributory negligence to simple negligence cases. There, the court held that comparative fault had no application where there has been a misrepresentation as to the applicable zoning in a land sale transaction. "[A]pplication of comparative fault principles, designed to mitigate the often catastrophic consequences of personal injury, would only create unnecessary confusion and complexity in such transactions." (*Id.*, at p. 897.)

We do not see how contributory negligence could have any application to fraud by concealment. The concealment alleged by the amendment and proved by the evidence was a deliberate, calculated act by Steinpress. There was no negligence involved. The court did give BAJI Nos. 12.30 and 12.35 concerning fraud and deceit and concealment. The jury was instructed that one of the elements of fraud by concealment is that the plaintiffs must have been unaware of the concealed fact. The corollary is that if the jury had found that the Godfreys were aware of the presence of the termites they would not be entitled to recovery. Thus, just as in a case of comparative fault, the jury was asked to evaluate the plaintiffs' conduct.

INSTRUCTIONAL ERRORS

 The trial court instructed the jury defining "broker"[2] with an additional instruction submitted by Steinpress.[3] BAJI No. 13.00[4] was submitted and withdrawn by the Godfreys and was not given. Steinpress now complains that the question of agency was of paramount importance in both concealment by fraud and in intentional infliction of mental distress, and the court committed reversible error in allowing BAJI No. 13.00 to be withdrawn.

 When reviewing the instructions given at trial, the appellate court must consider all the instructions as a whole, not severally, to determine whether error was committed. (*Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 947 [122 Cal.Rptr. 470].) Before an appellate court can reverse for errors in jury instruction, it must appear reasonably probable that, absent the error, the jury would have rendered a verdict more favorable to appellant. (*Bolen* v. *Woo* (1979) 96 Cal.App.3d 944, 951 [158 Cal.Rptr. 454].)

 It was not the question of agency which was of paramount importance, but rather the relationship between the parties which gave rise to a duty to disclose. Steinpress had a clear duty to disclose to the Godfreys the evidence he had regarding termite infestation, regardless of whether he was their agent. (*Lingsch* v. *Savage* (1963) 213 Cal. App.2d 729, 736-737 [29 Cal.Rptr. 201, 8 A.L.R.3d 537]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) Broker, § 2.113, pp. 152-153.) In the absence of an agency relationship, Steinpress had a duty to disclose the Clark report to the Godfreys and his failure to do so could form the basis of a fraudulent concealment. (See BAJI No. 12.36 on a party's duty to disclose.)

---

[2] "A 'broker' is a person who, for compensation or in expectation of compensation, carries on negotiations on behalf of another person with respect to real property. Among activities covered are: offers to buy, sell, rent, lease, or exchange, and soliciting, negotiating or collecting loans secured by real property. Business and Professions Code § 10131."

[3] "A broker acts as an agent when he sells or buys property for another. An agent may act as such for both Buyer and Seller in the same transaction, though his activities involve an exercise of discretion and the interests of the principal parties to the matter are essentially adverse, if both parties, with full knowledge of the dual agency, consent. 1 Cal RE Rev Part 2 § 4:18 P. 55."

[4] "One is the agent of another person at a given time if he is authorized to act for or in place of such person. For the purposes of this trial, the term 'agent' includes servants and employees and the term 'principal' includes employers."

Furthermore, there is substantial evidence that Steinpress was a broker/agent for both the Giannobiles and the Godfreys. Steinpress testified that he was representing both parties in the purchase of the property, and Debra Godfrey testified that she believed Steinpress represented her.

"It is well settled in this state that the law imposes on a real estate broker the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary [citation]." (*Ford* v. *Cournale* (1973) 36 Cal.App.3d 172, 180 [111 Cal.Rptr. 334, 81 A.L.R.3d 704].) The California Supreme Court said in *Batson* v. *Strehlow* (1968) 68 Cal.2d 662 [68 Cal.Rptr. 589, 441 P.2d 101] that "This relationship not only imposes upon him the duty of acting in the highest good faith toward his principal but precludes the agent from obtaining any advantage over the principal and any transaction had by virtue of his agency. [Citation.] 'Such an agent is charged with a duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]'" (*Id.*, at pp. 674-675; see also *Jorgensen* v. *Beach 'n' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 161-162 [177 Cal.Rptr. 882].)

When the two instructions on broker are read together with BAJI Nos. 12.30 and 12.35, they correctly state the law controlling the relationship that was created when Steinpress undertook to represent both parties to the transaction.

 Next, Steinpress alleges that there were errors in the court's instructions on intentional infliction of emotional distress, both in interspersing dictionary definitions with form instructions and in giving a form instruction on damages for emotional distress.

The court gave, inter alia, BAJI No. 12.72 defining emotional distress, BAJI No. 12.73 defining severe, BAJI No. 12.74 defining extreme and outrageous conduct,[5] BAJI No. 12.75 regarding the effect of the relationship of parties, BAJI No. 12.77 defining intentional and reckless, and BAJI No. 12.88 regarding damages for emotional distress.

---

[5]BAJI No. 12.74 as given reads as follows: "Extreme and outrageous conduct is conduct which goes beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community.

"Extreme and outrageous conduct is not mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. All persons must necessarily be expected

After the jury retired, they requested a dictionary and were refused by the court. The jury asked for a definition of extreme and outrageous and the trial court then reread BAJI No. 12.74. Later, the jury requested a copy of BAJI No. 12.74, and once again the trial judge reread BAJI No. 12.74. After asking the jurors if they wanted it reread, the trial court again gave BAJI No. 12.74. One of the jurors asked the judge to explain "outrage." The judge then referred to Black's Law Dictionary and stated, "What I'm going to do is define the word 'outrageous,' give you some synonyms for it. I'm concerned about your—and I want you to take the definition of this as only of the one word. And it's the whole phrase and how it's used that you must consider.... First of all, I'm going to read what the dictionary says about 'outrage.' And then I'm going to read to you the law with regard to the intentional infliction of emotional distress. [¶] 'Outrage' is defined as a grave injury; injurious violence; in general, any species of serious wrong offered to the person, feelings, or rights of another. Synonyms are affront, insult, and abuse. [¶] A plaintiff is entitled to recover damages for the intentional and unlawful infliction of emotional distress which proximately result in foreseeable physical harm."

The court also told the jury that severe emotional distress must actually and proximately be caused by extreme and outrageous unprivileged conduct. The judge then gave an example of what would be privileged conduct, the example relating to an officer who has to use force in arresting somebody. The court said, "Now, if it's extreme and outrageous, somebody who might have seen that might say, 'Gee, that's terrible. That officer was doing terrible things to that fellow.'" Then the court said that such conduct would be privileged.

The court then reinstructed on extreme and outrageous conduct by reading BAJI No. 12.74. The court also gave the BAJI instructions on emotional distress.

The jury then retired to continue deliberations.

Steinpress' trial counsel objected to the court's use of affront, abuse and insult. He said, "I think the BAJI instructions carry with it the im-

---

and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind.

"Extreme and outrageous conduct, however, is conduct which would cause an average member of the community to immediately react in outrage, if he heard the facts of the incident."

plication it has to be more than simple affront, simple oppression." The court responded, "Absolutely. That's why I read all of the instructions over to emphasize the fact that it was extreme and outrageous conduct."

The thrust of Steinpress' complaint on appeal is that the court improperly used words such as affront and insult as synonyms for outrageous.

It is significant that the trial court read BAJI No. 12.74 defining outrageous five separate times. This instruction specifically stated that insult was not enough. The judge told the jury that he was going to read the dictionary definition and then he was going to read them the law with regard to intentional infliction of emotional distress. The judge was reinforcing the jury's mind that it is the law that is important and not the dictionary definition.

Assuming that there was error, we believe it was harmless. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946] [setting out the factors in assessing prejudice for erroneous instructions].) The trial court's rereading of the proper instruction defining extreme and outrageous five times cured any error, if it existed.

Finally, Steinpress' contention of error that the court improperly instructed on damages for emotional distress is without merit. The court gave BAJI No. 12.88 as modified, which provides in part, "[¶] If, under the court's instructions, you find that the defendant Irwin Steinpress intentionally inflicted emotional distress upon plaintiff, you must determine the amount of plaintiff's damages proximately resulting therefrom."

■ A formula instruction directs a verdict for a party in the event that the jury finds certain facts to be true. The propriety of such an instruction depends upon whether it includes all of the legal elements essential to a verdict. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 212, p. 3029.)

In the instant case, the instruction on damages was not a formula instruction as it did not direct a verdict. (Cf. *Murrell v. State of California* ex rel. *Dept. Pub. Wks.* (1975) 47 Cal.App.3d 264, 268, fn. 2, 269 [120 Cal.Rptr. 812]; *Hubbard v. Calvin* (1978) 83 Cal.App.3d

529, 532-534 [147 Cal.Rptr. 905].) Moreover, the other instructions specifically covered the elements of intentional infliction of emotional distress; thus, there could be no prejudicial error. (*Id.*, at pp. 533-534; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 58 [118 Cal. Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

## DOUBLE RECOVERY

Steinpress complains that there was a wrongful double recovery. With refreshing candor, he concedes that case law is contrary to his contentions and, indeed, it is. Steinpress does not give any good reason why we should depart from the current state of the law which allows the recovery of damages for emotional distress and punitive damages. (*Merlo* v. *Standard Life and Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 19-20 [130 Cal.Rptr. 416]; and see *Alhino* v. *Starr* (1980) 112 Cal. App.3d 158, 177 [169 Cal.Rptr. 136]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 401-402, 404 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

## PUNITIVE DAMAGES

Steinpress urges that the Godfreys failed to offer any evidence that his failure to disclose was intentional and that, at most, the evidence indicated that he neglected to show the Godfreys a pest control report which indicated that Clark would charge more than Heaton. He argues that he had no reason at all to conceal the Clark report and further asserts that, had he revealed the Clark report, the situation would have remained unchanged. Steinpress also contends that the award of $60,000 punitive damages was excessive in view of the evidence and his net worth.

Steinpress' arguments virtually ignore 652 pages of trial transcript. The evidence, though in conflict, was substantial that Steinpress had read the contents of the Clark report, had knowledge of the termite infestation, and deliberately concealed that fact from the Godfreys. Debra Godfrey testified that she would not have purchased the property had Heaton reported there were termites.

In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ. Code, § 3294.) The defendant must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].)

An award of punitive damages will be upheld if supported by substantial evidence. (*Id.*, at pp. 922-923.) The appellate court will view the facts in a light most favorable to the judgment. (*Id.*, at p. 922.)

Turning to the amount of the award, Steinpress first testified his net worth was "in excess of several hundred thousand dollars." Later, he estimated his net worth to be $1.3 million, possibly.

Relying on *Little v. Stuyvesant Life Ins. Co.* (1977) 67 Cal. App.3d 451 [136 Cal.Rptr. 653], Steinpress argues that, although the award of $60,000 punitive damages represents only 6 percent of defendant's assets, the award is excessive. He also contends that if the award for mental distress is set aside, then the punitive damages would be excessive in light of the actual damages of $1,800.

When an award of punitive damages appears excessive or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, an appellate court will reverse the award. (*Little* v. *Stuyvesant Life Ins. Co., supra*, 67 Cal. App.3d 451, 469.)

The verdict indicates that the jury undoubtedly believed that Steinpress' tortious conduct justified the award of substantial punitive damages. The award was not excessive when we consider the relationship of the compensatory damages to the punitive damages, one to three, and Steinpress' net worth.

Next, Steinpress contends that punitive damages "were sought in the sum of $50,000 but were awarded in the sum of $60,000." Relying on *Meisner* v. *McIntosh* (1928) 205 Cal. 11 [269 P. 612], he asserts that the court has authority only to remand for retrial or remit the excess.

The amended complaint prayed for punitive damages in the amount of $15,000 for each of the four causes of action alleged against Steinpress, or a total of $60,000. The pretrial conference order recites "[b]y agreement at the pretrial conference plaintiffs' claim for punitive damages is deemed to be increased from $15,000 to $50,000."

The jury returned verdicts against Steinpress for concealment with intent to defraud (question No. 7) and extreme and outrageous unprivileged conduct (question No. 11).

"QUESTION NO. 12: Should plaintiff receive punative [*sic*] damages as a result of the Defendant's conduct upon which you found damages in either or both questions Nos. 7 and 11?

"Answer yes or no as to each Plaintiff.

"DAVID GODFREY: Yes.

"DEBRA GODFREY: Yes.

"As to each Plaintiff for whom you answered 'yes' in question No. 12, answer the next question.

"QUESTION NO. 13: What is the amount of punitive damages which Plaintiff shall receive from the defendant?

"DAVID GODFREY: $30,000.00.

"DEBRA GODFREY: $30,000.00."

As we have noted, the pretrial conference order increased the claim for punitive damages to $50,000 for each cause of action. Thus, the jury was limited by the complaint to awarding $50,000 punitive damages for emotional distress. (*Meisner* v. *McIntosh, supra*, 205 Cal. 11.) Fraudulent concealment was added by amendment at the end of trial, with no prayer that can be cited to the record.

The question then is not whether the court can sustain a damage award in excess of the prayer, but rather, can we confer punitive damages in the absence of a prayer? ▆▆ It is settled law in California that where the body of the complaint sets forth facts upon which an award of punitive damages may be predicated, the trier of fact can award punitive damages even in the complete absence of a prayer. (*Rogers* v. *Kabakoff* (1947) 81 Cal.App.2d 487, 491-492 [184 P.2d 312]; *Turner* v. *Whittel* (1934) 2 Cal.App.2d 585, 590 [38 P.2d 835]; *Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 264 [73 Cal.Rptr. 127].) "The fact that exemplary damages find no express mention in the prayer of the complaint does not preclude the allowance of such damages upon a contested trial." (*Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 606 [191 P.2d 432].)

The trial record in the instant case reveals that at the time of the oral amendment of the complaint to add fraud by concealment nothing was said concerning a prayer for damages. However, trial counsel did represent that he intended to argue the fraud by concealment, rather than negligent misrepresentation, so Steinpress was apprised that the Godfreys were still seeking exemplary damages.

There is no logical reason why the general rule as stated in *Vaughn* should not be applied to the facts of this case. Steinpress could not have been surprised by the award of punitive damages considering the entire case had been tried on the basis of fraud, and punitive damages were prayed for in the withdrawn cause of action.

EVIDENTIARY ERRORS

Steinpress next assigns numerous rulings on evidentiary matters as error. We will treat them seriatim.

A. *Medical Records.*

Steinpress attempted to introduce medical records relating to Debra Godfrey. The court sustained an objection of lack of foundation.

Steinpress now argues that the evidence was admissible under Evidence Code sections 1270 and 1271 as business records. He claims the evidence was relevant to the issues of alleged damages and failure to mitigate damages, and that the mental distress which Debra complained of arose years before the allegedly tortious conduct of defendant. They also contain evidence that Debra did not follow the recommended treatment.

We have examined the records and find that the critical part, a doctor's opinion regarding the cause of the headaches, would be inadmissible hearsay. (*People v. Reyes* (1974) 12 Cal.3d 486, 503 [116 Cal.Rptr. 217, 526 P.2d 225].) Even if the rest of the report and record were admissible it would be cumulative because Debra Godfrey testified that she had been suffering from headaches for seven years and that she had headaches before finding the termites. Thus, the jury was aware that the discovery of the termites was not the sole cause of the headaches. Any error was harmless.

B. *Sex Relations.*

We find no error in the trial court's refusal to allow Steinpress' counsel to examine the Godfreys as to the frequency of their premarital sexual relations.

C. *Depositions.*

Steinpress complains that depositions were used improperly in (1) refreshing David Godfrey's recollection and (2) for impeachment of Steinpress. We find no error in either instance.

D. *Heaton Testimony.*

Heaton testified that he told Steinpress that lowering his price for repairs to $600 would mislead the lenders. Steinpress' objection to the testimony is that it implies "that defendant Steinpress was a cheat." Steinpress did not object to the further testimony of Heaton that Steinpress told him, "You'll receive no more of our business if you don't do it. You've got to do it. There's three deals contingent on this. You're going to spoil the sale on three pieces of property, three different families. You've got to do it."

We believe the evidence was relevant and admissible. It was certainly probative on the issue of fraud.

### MISTRIAL

Steinpress contends that his motion for mistrial should have been granted. He cites as error (1) prejudicial errors in evidence tending to portray Steinpress as a cheat (we have discussed this issue under Heaton testimony above); (2) dismissal of all defendants other than Steinpress; and (3) admission of evidence of Steinpress' net worth.

Steinpress has offered no authority for the proposition that a piecemeal dismissal of defendants will result in an unfair trial, and we find no merit in this contention.

### CAUSAL RELATIONSHIPS

 Over objection, Debra Godfrey was allowed to testify as to the effect that the termites had on her. Steinpress argues that causation is a

legal question and the testimony of Debra Godfrey was insufficient to establish causation.

The jury was instructed on proximate causation. (BAJI No. 3.75.)

"The correct rule on the necessity of expert testimony has been summarized by Bob Dylan: 'You don't need a weatherman to know which way the wind blows.' The California courts, although in harmony, express the rule somewhat less colorfully and hold expert testimony is not required where a question is 'resolvable by common knowledge.' [Citations.]" (*Jorgensen* v. *Beach 'n' Bay Realty, Inc., supra*, 125 Cal.App. 3d 155, 163, fn. omitted.)

Certainly, the jury was capable of appreciating and evaluating the significance of termite infestation without resort to expert opinion as to the causal relationship between termites and distress.

### SUBSTANTIAL EVIDENCE

Steinpress' concluding plea is for the court to weigh "the multiplicity of discrepancies" in the testimony. He incorporates several previous arguments of error and apparently seeks reversal on a theory of cumulative error. We find Steinpress' contentions no more persuasive in the conjunctive than in the disjunctive. There was substantial evidence to support the verdicts.

### GODFREYS' APPEAL

In the verdict and special findings, the jury was asked, "[¶] What is the total amount of damages suffered by the plaintiff as a proximate result of the concealment or suppression? [¶] [The jury found] (a) The difference between the actual value of the property Plaintiffs received, and the value it would have had if there had been no fraud by the Defendant is $1,500.00 [¶] (b) The cost of removal of the house from the land is $650.00."

The Godfreys now contend that the findings are inconsistent. They refer to the testimony of two contractors who examined the property and concluded that the house could not be economically repaired and should be demolished. They contend that they were entitled to recover the value the house "would have had if it had been habitable and in the average condition of a house of its age." Further, they argue that the

appellate court can correct the error, even though no objection to the verdict was made in the trial court. (*Remy* v. *Exley Produce Express, Inc.* (1957) 148 Cal.App.2d 550 [307 P.2d 65].)

Steinpress, with a weight of authority, argues that the issue should have been raised in the lower court on a motion for new trial and was waived.

■ Steinpress is correct in the assertion that a motion for new trial is a prerequisite for appellate review if the claimed error is excessive or inadequate damages. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 279, p. 4268.) However, when a complaint is made that verdicts are inconsistent, no objection is required to preserve the issue for appeal. (*Cavallaro* v. *Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 105 [157 Cal.Rptr. 602]; *Remy* v. *Exley Produce Express, Inc., supra*, 148 Cal. App.2d 550.)

■ We find no inconsistency in the verdict. Rather, we find that the verdict and findings were not framed so as to solicit the desired response from the jury. The jury was instructed on the "benefit of the bargain rule."[6] That instruction calls for "the difference between the actual value of that which the plaintiff received [in this case, apparently nothing as far as the house was concerned] and the value which it would have had if the fraudulent representation had been true." Here, the fraudulent representation would be the express representation by Eneboe that once the Heaton reported damages were taken care of the house would be in good shape, and the implied representation that there was nothing wrong with the house that resulted from the concealment of the Clark report. In sum, what would the house have been worth if there were no termites? The evidence is in conflict on this point. The listing shows the improvements as worth $19,500. Steinpress said he thought the house was worth between $10,000 and $13,000 in March 1976. Mr. Dawson testified that the value of the house in August 1976 was, in his opinion, $14,500. If the jury had been asked the correct question, there was sufficient evidence to make an award based on the benefit of the bargain construction. Simply put, the jury was not asked the right question.

---

[6]BAJI No. 12.57 as given reads as follows: "If, under the court's instructions, you find that plaintiffs are entitled to a verdict against the defendants, you must then award plaintiffs damages in an amount that will reasonably compensate him for the

Confining the question to the house, excluding the land, the actual value of the property received was nothing and still would have been nothing if there had not been fraud by the defendant. Only by ignoring the question asked could the jury have awarded Godfreys the benefit of the bargain.

The Godfreys are, in effect, requesting the court to redraft the special verdict and then resolve the evidentiary conflicts as to value. We cannot do this, as we would be invading the province of the jury. Nor should we remand for retrial on this issue, as we perceive this to be the same as claimed error for inadequate damages. Remedial procedures for inadequate damages exist at the trial level.[7] We find that the Godfreys waived their right to assert error in this form.

The judgment is affirmed.

Franson, Acting P. J., and Andreen, J., concurred.

A petition for a rehearing was denied February 17, 1982, and the petition of defendant and appellant for a hearing by the Supreme Court was denied March 17, 1982.

---

loss suffered by them and proximately caused by the fraud upon which you base your finding of liability.

"The amount of such award shall be the difference between the actual value of that which the plaintiff received and the value which it would have had if the fraudulent representation had been true. This is sometimes referred to as the 'benefit of the bargain.'"

[7]Code of Civil Procedure section 619 reads as follows: "When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the Court, or the jury may be again sent out."