[Civ. No. 30773. First Dist., Div. Two. Dec. 14, 1973.]

LEWIS A. FORD, as Executor, etc., Plaintiff and Appellant, v. CLYDE COURNALE et al., Defendants and Respondents.

**COUNSEL**

John F. Harper, Harper & Cone and Naomi Litvin Helm for Plaintiff and Appellant.

Clifford J. Krueger for Defendants and Respondents.

**OPINION**

**TAYLOR, P. J.**—This is an appeal by the executor of the estate of Clara Ford[1] from an adverse judgment entered on a jury verdict[2] in her action

[1]After the filing of the notice, Clara Ford died and the executor of her estate was substituted.

[2]The notice of appeal also includes the order denying her motion for a judgment notwithstanding the verdict or new trial. As this order is not appealable, the purported appeal therefrom must be dismissed (Code Civ. Proc., § 904.1; *Morton* v. *Loveman,* 267 Cal.App.2d 712 [73 Cal.Rptr. 623]).

for fraud and misrepresentation against defendants, Clyde Cournale, a real estate broker, and his salesman, Michael R. Webb. We have concluded that the judgment must be reversed as the trial court erred in failing to properly instruct the jury on the fiduciary duties of a real estate broker, the elements of negligent misrepresentation, the applicable measure of damages, and in excluding certain evidence.

Viewing the record most strongly in favor of the judgment, the following chronology of pertinent facts appears: Mrs. Ford, a widow in her 70's, first met defendants in 1963 when they negotiated for her the sale of her former home in San Francisco. At all times here pertinent, defendant Webb was a licensed real estate salesman employed and supervised by defendant Cournale. As Mrs. Ford then lived in Marin County and the home sold by defendants was in San Francisco, most of the preliminary discussions and signing of papers was conducted by her adult son Lewis. Lewis and his wife lived with Mrs. Ford in a home in Larkspur that the three had purchased together.

As a result of the first transaction, defendants knew that Mrs. Ford had previously owned a small apartment house in San Francisco and also owned a service station in Novato, and that she was interested in acquiring other income property. Defendants submitted a variety of proposed properties to her, including a lease property in Redwood City. After making an independent personal investigation, Lewis believed that the Redwood City property would be a good investment. Lewis also executed a personal financial statement to aid his mother in the transaction. Subsequently, defendants strongly advised against it and asked Mrs. Ford and Lewis to sign a hold harmless agreement if they went through with the Redwood City transaction. Finally, Mrs. Ford decided against the Redwood City transaction.

Defendants, however, continued to look for additional income property for Mrs. Ford. They knew that she had acquired the gas station in Novato in 1958 for $62,500 and that it brought a net monthly income of $400. The lease, however, was subject to a renewal option at the discretion of the owner, Mobil Oil Company. Mrs. Ford was unable to ascertain whether Mobil was going to renew the option on the forthcoming renewal date. She asked defendants to obtain information about the renewal from Mobil but Webb could not obtain any more definite information as to Mobil's intent to renew than Mrs. Ford.

Over a six-month period in 1964, defendants submitted between 20 and 30 broker's statements of assorted income properties to Mrs. Ford. Finally after they had submitted the broker's statement on Harbor Towers in San

Rafael in December 1964, Lewis indicated that his mother might be interested in acquiring the property. The one-page broker's statement described Harbor Towers as a 42-unit apartment house with a swimming pool and laundry facilities. The broker's statement indicated that: 1) the sale price of the property was $550,000; 2) the property was encumbered by a first and second mortgage, totaling $475,156, with respective monthly payments of $1,980 and $1,100, totaling $3,080; and 3) the gross monthly rental income was about $5,366.50 (amounting to a gross annual of $64,398, less $14,410 of maintenance and management expenses) amounting to an annual income of $49,928; subtracting the $36,960 annual mortgage payments would leave a net of $12,968.

Shortly after indicating his mother's interest in the property, Lewis, along with Webb, went to inspect the Harbor Towers that was located about five miles (or a 10-minute drive) from the family home in Larkspur. Lewis and Webb spent about 45 minutes to an hour at the property and saw 10 of the apartments. At this time, Webb told Lewis that there were three or four vacancies but that the building should easily run at 100 percent occupancy as it was the only one in the area that took both children and pets. Subsequently, on December 15, 1964, Webb, Lewis, Mrs. Ford and an unidentified person who worked for the previous owners (a partnership of real estate brokers, Mapes, et al.) spent about one-half hour at the Harbor Towers. They visited the three or four empty units and had some discussion of maintenance expenses but did not speak to the resident manager at the request of the owners. Immediately after his visit to Harbor Towers, Webb proceeded to Mrs. Ford's home to write up an offer to exchange the Novato service station, with its mortgage of $4,250, for Harbor Towers.

The exchange agreement indicated that it was subject to confirmation of rent schedules and rent deposits, and that defendants were to receive a commission of $4,250. The exchange was accepted on December 16, 1964, with a supplementary agreement indicating that the monthly payment on the first mortgage was $2,804 (instead of $1,980, because of a trust fund for taxes), and on the second, $1,240, or a monthly total of $4,044 (an annual total of $48,528).

Both Webb and Cournale knew that Mrs. Ford was concerned that the Mobil Company would not renew her lease on the service station and was interested in additional income and growth. Her net income from the service station was $400 per month. Webb assured her that her net income from Harbor Towers would be between $700 and $900 a month. He also told her that the Harbor Towers building had been excellently maintained and that if the property did not suit her, it could easily be resold.

At the time Webb made these statements to Mrs. Ford, he had not made any check of maintenance or other expenses and income records of Harbor Towers. Cournale was aware of the representations made by Webb to Mrs. Ford concerning the income and condition of the property. He did not feel, however, that it was necessary to make any further investigation of the books and records of the owners as they were dealing directly with the owners and could, therefore, rely on the monthly income in excess of $5,000, as stated. Cournale admitted, however, that the broker's statement was based on 100 percent occupancy and he knew the vacancy figures were not and could not be totally accurate.

After Mrs. Ford indicated that she was interested in a rental history and some vacancy figures on the property, Webb promised to obtain these for her. He, however, did not expect her to conduct any independent investigations or seek any other information, as he was aware that she was depending on him. Mrs. Ford, who was in good health and capable of making up her own mind, relied only on the advice of Webb and Cournale.

Mrs. Ford received from Webb a letter dated December 29, signed by one of the owners indicating vacancies, as set forth below,[3] and further stating that the figures were "an average—at times we run 100%—but these figures are average or as close as I can figure." Webb computed for her that the $700-$900 monthly income figure was based on no vacancies and that taking into account the average rental loss for the last six months, she could expect a monthly net income of $600. Thereafter, the escrow instructions were prepared. Cournale made his first inspection of the property after the escrow instructions had been prepared and spent 45 minutes at Harbor Towers and saw the three or four vacant apartments. On December 29, both Webb and Cournale again met with Mrs. Ford for a signing of the final papers. Cournale explained the terms and the purpose of the trust fund. Webb and Cournale reiterated the former representations that the property would receive a net income of $700 to $900 a month and that it was well worth the $550,000 price. They also indicated to her that the $75,000 allowed for the service station was a very good figure. She believed this as she had previously listed the station at this price with other brokers and had received no offers. As experienced brokers, Webb and Cournale knew that the facts set forth in a broker's

[3]July – 3
August – 2
Sept. – 3
Oct. – 2
Nov. – 4
Dec. – 3

statement had to be adjusted and interpreted to laymen; vacancy factors were not customarily listed in broker's statements as the vacancy rate depended on management of the property.

At this time, Mrs. Ford went over the expenses as shown on the broker's statement and they seemed normal to her on the basis of her prior experience as an apartment owner. However, previously she had owned only a few units and no other areas requiring maintenance, like a pool. She also had no prior experience with a trust fund for taxes and insurance.

Although Lewis lived at the same home with his mother, there was no extensive discussion of the entire Harbor Towers transaction with him or his wife. After relating his impression after his initial visit with Webb, Lewis was not directly involved in the transaction.[4]

Escrow closed on January 6, 1965, and Mrs. Ford took possession of Harbor Towers. Then, for the first time, she talked to the resident manager and saw a number of apartments. Mrs. Ford discovered that a large number of apartments were leaking, that there were maintenance problems with the drapes and carpets and difficulties with some of the tenants who had not yet been evicted for nonpayment of rent. Although at the time of her first visit to the property in the middle of December 1964 there were only three vacancies, by the time she took possession a few weeks later in January 1965, there were eight vacancies. In addition, the resident manager received her $100 a month apartment rent free and was also reimbursed for some of the painting and other maintenance work done by her husband. Mrs. Ford normally was able to collect monthly rentals of only about $4,200, a figure far below the monthly gross of $5,136 set forth in the broker's statement. As the monthly mortgage payments were in excess of $4,044, there was never enough income from the property to meet all of the fixed and maintenance expenses. In January 1965, against the advice of Cournale, but on the advice of one of the former owners, Mrs. Ford spent $3,500 to waterproof a portion of the property, and $700 on draperies.

In February 1965, Mrs. Ford approached Cournale for a $15,000 loan on the property. He took a third mortgage from her but was unaware of the fact that she was presently in financial difficulties as she had only owned the property for a very short period of time. As Webb and Cournale had also informed Mrs. Ford that if the property did not suit her they could very easily resell it for her, in June 1965, Mrs. Ford and Lewis asked

[4]Defendants' argument that Lewis was heavily involved in the Harbor Towers transaction is not borne out by the record. While Lewis was involved in the Redwood City transaction to the extent of providing a personal financial statement and making an independent investigation, there is no indication that he was involved in the Harbor Towers negotiations, except for the first two visits to the property.

them to again list the property for sale for $565,000, and provided projected and expense figures that were similar to those that they had originally received. Neither at the time of the loan in February nor in the summer of 1965 did Mrs. Ford make any accusations of fraud to Webb and Cournale. By November 1965, Mrs. Ford was in default on the first mortgage. By March 1966, she was also in default on the second, but paid out certain amounts for painting. In April 1966, when the defaults were close to $20,000, Lewis drew his manager's salary of $2,758 ($150 per month). In May 1966, Mrs. Ford lost the property when the holder of the first mortgage foreclosed. Subsequently, she was able to recoup about $3,000 of her investment in the personal property from the holder of the first mortgage, Redwood Land Corporation. In January 1968, after the real estate market had dropped substantially, Redwood Land resold the Harbor Towers for about $380,000.

Mrs. Ford's expert appraised the fair market value of the Harbor Towers at the time of the exchange in 1964 at $350,000. He admitted that on this basis, the mortgage holders had greatly overvalued the property as at that time, the first mortgage was $290,000 and the second $185,000, a total of $475,000. The defense expert appraised the property at $550,000 as of December 1964. All of the experts agreed that from 1966 to 1968, a serious decline had occurred in the real estate business.

The prior owners, a group of brokers, had acquired Harbor Towers six months earlier for very little cash down and the closing expenses. From July to December 1964, the rental income was not sufficient to meet the fixed mortgage and maintenance expenses, according to defendants' own witness; on a cash receipts basis, defendants' witness indicated a net income of $229 for the six months of ownership; Mrs. Ford's witness, $93.80 on the same basis.

While Webb and Cournale could not be expected to foresee some of the factors that may have increased Mrs. Ford's losses, such as the subsequent drop in the real estate market, the heavy rains of 1964-1965, and the consequences of Lewis' inexperienced management, the uncontroverted evidence indicates that Webb and Cournale knew that Mrs. Ford was primarily concerned with increasing her income.[5] Webb and Cournale had no basis other than the broker's statement for representing to her that Harbor Towers would yield a net income of $700-$900 a month. There can be no

---

[5]Webb understood that finding something for Lewis to do was a secondary consideration. Defendants' contentions concerning Lewis' mismanagement of Harbor Towers and paying excessive amounts for plumbing and other work are not borne out by the record.

question that under the circumstances of this case, the amount of net income was a material fact (*Nathanson* v. *Murphy,* 132 Cal.App.2d 363, 369 [282 P.2d 174]). As brokers, they knew that the primary purpose of the broker's statement was to provide a basic description and information to the buyer, and that the information was incomplete and had to be supplemented, and that some aspects, such as the vacancy figures, were based on 100 percent occupancy and were simply "puffing."

Although Webb and Cournale knew that Mrs. Ford owned the service station and had owned other income property before, they were aware that none were of the size, scope and complexity of Harbor Towers, as the matter of the trust fund for taxes and insurance had to be explained to her. The books and records of the previous owners were available for inspection, but they made no attempt to do so and did not expect Mrs. Ford to do so. In fact, Mr. Cournale believed that it was not necessary to verify the information provided by the former owner, even though the corrected monthly mortgage expenses, as shown on the supplement to the exchange agreement, indicated fixed monthly expenses of $4,044, or annual fixed expenses of $48,528. If this amount is subtracted from the $49,928 net annual income shown on the broker's statement, it is readily apparent that the annual income would be only $1,400—far below the $700-$900 a month figure they continued to represent to Mrs. Ford. With fixed monthly mortgage expenses of $4,044, they should have ascertained whether, in fact, Harbor Towers produced sufficient income to meet these and the monthly maintenance expenses that would necessarily be rather high with so many units rented to families with children and other areas like the swimming pool and laundry that also required maintenance. ■ It is well settled in this state that the law imposes on a real estate broker the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary (*Batson* v. *Strehlow,* 68 Cal.2d 662, 674 [68 Cal.Rptr. 589, 441 P.2d 101]).

■ In the absence of the correct instructions on the fiduciary duties of a real estate broker, the jury would not be aware of any duty not to misrepresent the material facts of the amount of income and the duty to disclose all material facts. In the absence of the requested instructions, the jury could have also concluded that Mrs. Ford was under a duty to make her own investigations. In fact, Mrs. Ford did not have the duty of checking out all of the apartments and talking to the manager, as she had been dissuaded from doing so by defendants at the request of the prior owners (*Wells* v. *Lloyd,* 21 Cal.2d 452 [132 P.2d 471]).

The trial court erred in modifying Mrs. Ford's proffered instruction No.

18 to eliminate any reference to the fiduciary duties of principal and agent, as set forth below.[6] Defendants assert that the matter was adequately covered by the other instructions on principal and agent. The record, however, indicates that only general instructions on agency were given.[7] No

[6]"The relationship of an agent to his principal is of a fiduciary nature, similar in many respects to the relationship of a trustee to his beneficiary. In acting for his principal an agent is bound to the same standards of conduct of undivided service and loyalty of integrity and good faith as a trustee. As a matter of law the relationship binds the agent to the utmost good faith not only in form but also in substance. This standard requires a high degree of honesty, loyalty and integrity, and the most faithful service. Where there exists such a relationship of trust or confidence, it is the duty of the one in whom trust and confidence is reposed, such as trust and confidence reposed by a purchaser in his real estate broker to make a full disclosure of all material facts respecting the property or relating to the transaction in question and the real estate broker's duty as one in whom trust and confidence is reposed is to make a full and complete disclosure of all material facts to his purchaser; failure to make a full and complete disclosure or any concealment of a material fact amounts to and is the equivalent of an affirmative misrepresentation or fraud upon his own principal."

[7]"Now, one is the agent of another person at a given time if he is authorized to act for or in place of such person. One may be an agent although he receives no payment for his services. For the purposes of this trial, the term agent includes servants and employees and the term principal includes employers."

"It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's authority. Such conduct is within the scope of his authority if it occurs while the agent is engaged in the duties which he was employed to perform and relates to those duties. Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority."

"Now, the defendants are sued as principal and agent, the defendant Clyde Cournale as the principal and the defendant Michael Webb as his agent."

"If you determine that defendant Michael Webb is liable, then you must find that defendant Clyde Cournale is also liable."

"It is established that Michael Webb was the agent of defendant Clyde Cournale. Therefore, any act or omission of Michael Webb was in law the act or omission of defendant Clyde Cournale."

"Ladies and gentlemen, a real estate salesman within the meaning of the law is a person who, for a compensation or an expectation of a compensation, is employed by a real estate broker to negotiate to sell, or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property."

"A real estate broker within the meaning of the law is a person who for a compensation or an expectation of a compensation, does or negotiates to sell, or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property."

"You are instructed that it is unlawful for any real estate broker or salesman to do any of the following:

"1. Make any substantial misrepresentation;

"2. Make any false promises of a character likely to influence, persuade or induce;

"3. Engage in any other conduct, whether of the same or a different character than specified above, which constitutes fraud or dishonest dealing."

instruction set forth the fiduciary duties of an agent to his principal. The court also refused Mrs. Ford's proffered instructions Nos. 8, 15, 19, 20, 21, 23, 39 and 47, all set forth below,[8] that explain the responsibilities relating to the misrepresentation on nondisclosure of material facts that grow out of the fiduciary relationship.

■ The record also indicates that the court failed to properly instruct, as requested, on negligent misrepresentation and on the proper measure of damages. Contrary to defendants' assertions, the general instruction given on burden of proof did not adequately cover the negligent misrepresentation, as set forth in Mrs. Ford's requested instructions 7 and 38, set forth in the footnote below,[9] or constructive fraud, as defined by Civil Code

---

[8]"A fact is material if it is one which would be likely to affect the principal's judgment and an agent must disclose to his principal every material fact known to him bearing upon the value of property with which the parties are dealing, the concealment of which would lead to the principal's injury."

"A person has a right to rely on statements of material facts essentially connected with the substance of the transaction where there is a confidential relation existing between the parties. Consequently, a principal is entitled to rely on the truth of a representation made to him by his agent with reference to the terms of the very transaction for which the agent is employed."

"Where there exists a relationship of trust and confidence, it is the duty of the one in whom the trust and confidence is reposed, to make full disclosure of all material facts within his knowledge, relating to the transaction in question and any concealment of material facts is a fraud."

"Where any relation of confidence or trust exists between a purchaser and a real estate broker which demands that the information communicated by the real estate broker respecting the property be full and complete, any concealment of material fact amounts to fraud."

"An agent is charged with the duty of the fullest disclosure of all material facts which might affect the principal's decision. Failure to disclose may be equivalent to an affirmative misrepresentation."

"A person has a right to rely on statements of material facts essentially connected with a substance of a transaction where there is a confidential relation, a relationship of trust, and a fiduciary relation existing between the parties, and such reliance cannot be charged as negligence."

"A real estate broker and agent is charged with the duty of the fullest disclosure of all material facts which might affect the buyer's decision. Failure to disclose may be equivalent to an affirmative misrepresentation."

"A real estate broker or agent is not authorized to do any act which a trustee is forbidden to do by Section 2228 of the Civil Code. Section 2228 of the Civil Code provides as follows: 'In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.'"

[9]"Actual fraud is committed where, with the intent to induce another to act in reliance thereon, a person makes a positive assertion in a manner not warranted by his information, of that which is not true, though he believes it to be true. If, therefore, one asserts that a thing is true within his personal knowledge, or makes a statement as of his own knowledge, or makes such an absolute, unqualified and positive statement as implies knowledge on his part, when in fact he has no knowledge of

section 1573. The court gave only an instruction on deceit based on Civil Code section 1710, and actual fraud, based on Civil Code section 1572. That instruction alone does not clarify that the requisite intent in a cause of fraud is an intent to induce action and not a specific intent to deceive (*Nathanson v. Murphy*, 132 Cal.App.2d 363 [282 P.2d 174]). Accordingly, the court should have also given Mrs. Ford's requested instructions 3 and 9, set forth below.[10]

█ The court's instructions on damages were incomplete.[11] The court erroneously refused Mrs. Ford's instruction No. 37, based on *Garrett* v. *Perry*, 53 Cal.2d 178 [346 P.2d 758], which held that it is proper to consider circumstances occurring after a fraudulent transaction, such as foreclosure, to calculate the actual loss. This court (division 3) held in *Burk-*

---

whether his assertion is true or false, and his statement proves to be false, he is as culpable as if he had wilfully asserted that to be true which he knew to be false, and is equally responsible for fraud."

"A party is guilty of fraud when he negligently, carelessly or with lack of foresight, makes representations or commits acts, the natural and necessary consequences of which will cause deception, though such party acts under the honest representation that he is violating no obligation or invading no right."

[10]"The essential intent in a case of fraud is an intent to induce action; there need not be a specific intent to deceive."

"It is not necessary for the plaintiff herein, in order to prevail, to prove that the representations were the sole inducement to the entry into the exchange contract, but the representations or representation must be of such nature, weight and force that you can say that without them the contract would not have been made. It is not necessary that the plaintiff prove that there was more than one mis-statement or one false representation of a material fact in order to recover damages for fraud in this case. Plaintiff need only prove that a representation or suppression of a fact by the defendants was of such nature, weight and force that without such suppression or representation, contract would not have been made. It is not necessary for the plaintiff to prove the fact misrepresented or the fact suppressed was the sole inducement to the contract."

[11]"One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that which the defrauded person paid and the actual value of that which he received, together with any additional damage arising from the particular transaction."

"If you find that plaintiff has suffered actual damage as a proximate result of the acts of defendants on which you base your finding of liability, you may in your sole discretion award additional damages against defendants, known as punitive or exemplary damages, for sake of example and by way of punishing defendants if, and only if, you find by a preponderance of the evidence that said defendants have been guilty of fraud."

"The law provides no fixed standard as to the amount of such punitive damages, but leaves the amount to the jury's discretion, exercised without passion or prejudice."

"You are further instructed that Section 3294 of the California Civil Code reads as follows: 'In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, expressed or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.' "

*house* v. *Phillips,* 18 Cal.App.3d 661, at page 665 [96 Cal.Rptr. 197], that it was reversible error not to give an instruction concerning the foreclosure, stating: "Although the measure of damages of section 3343 of the Civil Code is exclusive in the sense that the defrauded party may no longer receive anticipated profits as damages, an exception has been made in that damages need not invariably be the difference in value between market price and purchase price at the time of the purchase. '. . . The section must be applied realistically so as to give the defrauded person his actual out-of-pocket loss, and, where necessary to reach that result, the court must consider subsequent circumstances. . . .' (*Garrett* v. *Perry,* 53 Cal.2d 178, 184 [346 P.2d 758].) Foreclosure of the property as a circumstance which may be considered is illustrated in the *Garrett* case and also in the case upon which it relies, *Feckenscher* v. *Gamble, supra,* 12 Cal.2d 482 [85 P.2d 885].

"Under section 3343 when there is no difference between the sale price of the land and its market value, it is possible that a purchaser may establish all the elements of fraud and yet recover nothing. 'The plaintiff, e.g., may, after considerable effort, conclude an apparently profitable real estate investment. However, if it turns out that he has simply exchanged his money for property equivalent in value (as determined by the jury or found by the trial court), he cannot get damages; his only remedy is to rescind and get back his money.' (2 Witkin, Summary of Cal. Law (1960) Torts, § 426, p. 1624; see also *Oliver* v. *Benton,* 92 Cal.App.2d 853 [208 P.2d 375].)"

Here, as in *Burkhouse, supra,* Mrs. Ford could not rescind the transaction as the property has been sold to third parties in the foreclosure sale. Likewise, with this and the other errors in the instructions here, we cannot determine whether the jury found absence of misrepresentation or absence of damages. As the entire case must be reversed for retrial under proper instructions on agency, fraud, negligent misrepresentation and damages, we comment briefly on the remaining contention concerning the admission of evidence.

■ The trial court erred in preventing Webb from testifying whether or not he was Mrs. Ford's agent in the Harbor Towers transaction. The record indicates that an objection to the question was sustained, either on grounds that it called for his conclusion or because it was not based on facts. The uncontroverted evidence, however, indicated that Webb was acting as her agent and that Webb and Cournale received a commission. The ultimate question for the jury was not his agency but whether he had breached his duties as an agent.

Earlier, Webb testified that he worked for Cournale as a salesman and

had acted for Mrs. Ford as her agent in the sale of her home in San Francisco. In any event, Webb was qualified to give his opinion of whether or not he was acting as her agent (Evid. Code, § 720, subd. (a).) As Mrs. Ford's case was based on a breach of the fiduciary duties, this error was also prejudicial.

The appeal from the order denying motion for judgment notwithstanding the verdict or a new trial is dismissed. The judgment is reversed.

Kane, J., and Rouse, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied February 7, 1974.