[Civ. No. 68719. Second Dist., Div. Three. Jan. 31, 1984.]

DALLAS H. GRAY III et al., Plaintiffs and Respondents, v. DAVID H. FOX, as Real Estate Commissioner, etc., Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Raymond B. Jue, Deputy Attorneys General, for Defendant and Appellant.

Fogel, Rothschild, Feldman & Ostrov and Richard L. Rosett for Plaintiffs and Respondents.

OPINION

**KLEIN, P. J.**—Defendant and appellant Real Estate Commissioner of the State of California (Commissioner) appeals from an order directing payment

to plaintiffs and respondents Dallas H. Gray III and Susan L. Gray (the Grays) of money from the Real Estate Fund for purposes of education, research and recovery (Fund).

Since the Grays sustained their burden of proving they were defrauded by Stephen Hobbs (Hobbs), a licensed real estate broker, acting in the course of a licensed real estate transaction, the judgment is affirmed.

### PROCEDURAL AND FACTUAL BACKGROUND

On February 6, 1980, the Grays filed a complaint in the Los Angeles Superior Court for fraud, deceit, negligent misrepresentation, and breach of contract against Hobbs.[1] The complaint identified Hobbs as a licensed real estate broker acting as a broker in a fiduciary relationship with the Grays. The breach of contract count alleged that the Grays owned certain real property; that Hobbs executed an agreement to purchase the property; and that Hobbs failed to consummate the purchase.

The fraud and deceit and negligent misrepresentation counts averred that Hobbs fraudulently induced the Grays to sell the property to him, and that Hobbs was actually planning to sell the property to a third party (the Raffertys) at a higher price than he offered to pay the Grays. The complaint sought compensatory and exemplary damages.

The Grays' evidence at the default hearing on this complaint disclosed that the contract purchase price was $120,000, and that the price at which the house was actually sold by the Grays to another buyer because Hobbs did not go through with the deal was $115,000. The Grays claimed damages equal to the difference between $115,000 and $144,000, the price at which Hobbs allegedly planned to sell the property to the Raffertys. A default judgment was entered, awarding the Grays $5,000 in damages.

The Grays thereafter filed an application seeking payment from the Fund,[2] and noticed a hearing in the trial court on the application. The Commis-

---

[1] Hobbs is not a party to this appeal.

[2] The Fund was created by statute in 1963 to provide for compensation to persons aggrieved by the acts of real estate licensees (salespersons and brokers) licensed under the provisions of division 4 of the Business and Professions Code (the portion of the code governing the real estate industry).

All subsequent references to the Business and Professions Code will be by section number only.

Section 10471, subdivision (a) provides in part: "(a) When any aggrieved person obtains a final judgment . . . against any person or persons licensed under this part, under grounds of fraud, misrepresentation, deceit, . . . arising directly out of any transaction when the

sioner filed a response to the application and the matter was relitigated on July 28, 1982.[3] Hobbs could not be located and did not appear; the only witnesses were Susan L. Gray and Carol Moulton (Moulton), the Grays' listing broker.

At the hearing, the Grays produced relevant evidence as follows: In May 1979, the Grays listed their home for sale with Sterpa Realty (Sterpa) through its employee, Carol Moulton (Moulton). An interested buyer from Ireland offered $110,000. The Grays counteroffered $120,000 and the buyer accepted. Sometime in June 1979, Hobbs did an appraisal of the Grays' home and expressed an interest in buying it if anything were to go wrong with the proposed sale. The overseas deal did fall through, and Hobbs and Sterpa arranged for a sale of the property to Hobbs, with Hobbs to split the $7,200 commission on the sale with Sterpa. The two page "Real Estate Purchase Contract and Receipt for Deposit" had typed in "Seller is aware that Buyer is a licensed real estate broker." It also stated that "[s]eller has employed Sterpa Realty Register/Steve Hobbs as Broker(s) and agrees to pay for services the sum of 6% of sales price." Hobbs signed his name in the space provided following the words "Real Estate Broker." Where the form read, "Buyer does ☐ does not ☐ intend to occupy subject property as his residence," Hobbs checked "does."

The Grays made a counteroffer on or about July 2, which Hobbs did not accept. In Hobbs' counteroffer thereto, the escrow period was extended 45 days, and the escrow company was changed to Interstate Escrow at Hobbs' request.

Escrow instructions number I 25764 A were prepared at the Interstate Escrow Company (Interstate) dated July 9, 1979. These instructions provided that commissions of $3,600 each were to be paid to Sterpa and Hobbs.

One day later, July 10, escrow instructions number I 25765 A were drawn up for the same property with the Raffertys as purchasers, price to be $144,000.

---

judgment debtor was licensed and performed acts for which a license is required under this part, and which cause of action occurred on or after July 1, 1964, the aggrieved person may, . . ., file a verified application in the court in which the judgment was entered for an order directing payment out of . . . [the Fund] . . . ."

Section 10471, subdivision (a) requires that a verified application also be served on the Commissioner, and upon such service in this action, the Commissioner, as the designated and authorized custodian of the Fund, thereafter became a party.

[3]Because the underlying judgment was by default, the Grays had the burden of proving that their cause of action against the licensee was for fraud, misrepresentation, or deceit. (§ 10473.)

Pursuant to the purchase contract, Hobbs was to obtain an 80 percent loan with Contempo Mortgage Corporation (Contempo). The escrow instructions provided that "buyer" was to obtain a new loan on the subject property for at least $96,000. There was no evidence that Hobbs applied for a loan, but the Raffertys applied for a loan with Contempo two days after their escrow opened on July 13, 1979. That application listed the "selling office" as "Steve Hoobs [*sic*]" and the "listing office" as "Carlole [*sic*] Moulton." Toward the end of the 45-day escrow, Hobbs had another appraisal of the Grays' property done by one Thompson. This appraisal was for $134,000.

Hobbs did not deposit money into the Grays-Hobbs escrow by the end of the 45-day period and the Grays threatened cancellation in early September.

On or about September 9, the Grays received a letter at their property addressed to the Raffertys. They became concerned that Hobbs might be trying to "cheat" them. Thereafter, Moulton was able to get Hobbs to sign cancellation papers. The Grays were under pressure to make payments related to the property they were purchasing and they accepted a cash offer of $115,000.

On October 1, 1982, the trial court ordered payment from the Fund.

## CONTENTIONS

The Commissioner contends that Hobbs did not commit fraud, misrepresentation or deceit with respect to the Grays, and that Hobbs was not performing acts in his dealings with them for which a real estate license was required.[4]

## DISCUSSION

1. *Standard of review.*

It must be remembered that in this appeal, we are dealing with the Grays versus the Commissioner as custodian of the Fund and that Hobbs is not a party.

The Fund was created by the Legislature to compensate individual members of the public who are defrauded by real estate licensees in the course of a transaction for which a license is required, provided applicants comply with the statutory requirements. (§§ 10471, 10473.)

---

[4]The parties stipulated that these two contentions were the only issues on appeal.

The record before us is adequate to support an affirmation of the trial court's ruling binding the Fund on relitigation of the issues, since all intendments and presumptions are indulged to support the matters as to which the record is silent. ■ It is the province of the trial court to decide what reasonable inferences will be drawn from the evidence presented. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Fuller v. Lindenbaum* (1938) 29 Cal.App.2d 227, 230 [84 P.2d 155]; *McIntyre v. Doe & Roe* (1954) 125 Cal.App.2d 285, 287 [270 P.2d 21]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 235, 245, 254.) ■ There exists sufficient evidence to uphold the trial court's implied finding that Hobbs' conduct constituted fraud, misrepresentation or deceit and that his conduct required a real estate license.[5]

### 2. *Hobbs' conduct as a broker.*

Hobbs' involvement in the proposed sale of the Grays' property could not have been accomplished without a real estate license. Although he could have avoided broker status by engaging in a straight purchase of the Grays' property as a principal, after having disclosed the fact that he was a broker, he had a much more elaborate scheme in mind.

Hobbs started out by appraising the Grays' property before offering to buy it. In the purchase contract, he held himself out as a broker with the language that "seller has employed *Sterpa Realty Register/Steve Hobbs as Broker(s)* and agrees to pay for services the sum of 6% of sales price." He was an independent broker and had no connection with Sterpa. Unquestion-

---

[5]At the close of the presentation of evidence and counsels' argument, the trial court made the following observations: "It seems to me that many of our professional-type services like a broker or an attorney or other business advisers . . . sometimes confuse their functions when they see the possibility of a profit to themselves, and I don't think it's good practice to inject your own desires for monetary gain when you are supposed to be in a position of trust and confidence in trying to advise or represent some party in the matter. [¶] . . . . [¶] I don't think it's good practice to do that but, as I say, a lot of times people do. . . . I think it's unfortunate, in my view, that the Attorney General's Office is called upon, and they be in this case to try to protect the fund, shall we say, when in fact if they were called upon to delve into the activities of the broker here, they might be wearing a different hat. Because it doesn't, to me, Mr. Jue, with all due respect, does not border on the ethical type or procedure that you and I and Mr. Rosett would like to see happen. [¶] If a guy wants to buy a piece of property and go out and tell everybody: 'I'm buying this piece of property. I don't expect to make a commission on it. I'm a buyer. I'm an individual. And Mrs. Moulton, you're the broker for this transaction and you're going to get your commission. I don't want any part of it. I just want to make a good deal here for myself. I'm going to buy this house.' [¶] But the whole thing kind of smacks of something a little bit different here. You know, human nature is as it is, and he saw a chance to get a commission here and make a fast sale there. A lot of big money going on for him. Had he been successful—what did you say? $26-or-$27,000, or whatever it was—the Grays wouldn't have known the difference, nobody would have known the difference. But it didn't come to pass."

ably, he arranged to receive part of the commission for the sale of the Grays' property.

Either before or during the escrow period, he procured the Raffertys as buyers of the Grays' property at a price of $144,000. He arranged for another appraisal by Thompson, which came in at $134,000.

Hobbs set up a "double escrow," with the Grays-Hobbs escrow No. I 25764 A to close July 9, and the Hobbs-Raffertys related escrow No. I 25765 A to be effectuated a day later on July 10. The first escrow indicated that a $3,600 commission was to be paid to Hobbs, "license number 1-519938-5."

The Raffertys' loan application at Contempo contained information that Moulton was the "listing office" on the property and Hobbs was the "selling office," which property was still owned by the Grays at the time. Presumably, the Raffertys received this information from Hobbs, because Moulton had never met the Raffertys and was never a part of Hobbs' scheme.

Hobbs had the escrow extended 45 days so that he could consummate this deal. He was to have obtained a loan also at Contempo so as to purchase the Grays' property. There was no evidence that Hobbs ever applied for the loan, but the Raffertys applied for one on July 13, 1979, two days after their escrow opened. Hobbs never deposited any money into the Grays-Hobbs escrow.

It is clearly within the realm of reasonable inferences that the sale of the Grays' property to Hobbs was conditioned on Hobbs' being able to utilize the funds in the Hobbs-Raffertys escrow as money to close the Grays-Hobbs escrow. Thus, the entire package was one transaction.

The facts substantiated that the substance of this transaction was to be a sale by the Grays as sellers of their property to the Raffertys as purchasers without their knowledge of the facts, and with real estate broker Hobbs acting as a conduit. Hobbs planned to facilitate the transfer of title for a fee from the Grays to the Raffertys, and it was never his intent to hold title to the property. Hobbs was in effect acting as a broker for the Grays as sellers and the Raffertys as buyers.

He voluntarily engaged in this course of conduct and is presumed to have known the legal obligations that would naturally flow from his acts. He deliberately placed himself in a position whereby he assumed the status of broker.

■ With broker status comes fiduciary duties, which include the obligation of acting with the utmost good faith and honesty toward the seller, and precludes the broker from assuming a position adverse to the seller without the seller's consent. There also flows a duty to disclose to the seller all facts within the broker's knowledge which are material to the sale. (*Estate of De Hart* (1961) 196 Cal.App.2d 452, 455 [16 Cal.Rptr. 603]; *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 741 [336 P.2d 534]; *Realty Projects, Inc.* v. *Smith* (1973) 32 Cal.App.3d 204, 210 [108 Cal.Rptr. 71]; *Adams* v. *Herman* (1951) 106 Cal.App.2d 92, 98-99 [234 P.2d 695].)

■ Hobbs had the duty to disclose to the Grays that indeed he was not buying their property for himself but already had a buyer willing to pay $144,000 for it. His failure to disclose constituted fraudulent conduct.

### 3. *Conduct fraudulent and deceitful.*

The provisions of the Business and Professions Codes which provide for recovery against the Fund do not define the terms "fraud, misrepresentation and deceit;" therefore we look to the Civil Code for definitions of these terms.

Fraud can be either actual or constructive. Civil Code section 1572 provides in relevant part: "Actual fraud, . . ., consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] . . .; [¶] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [¶] 4. A promise made without any intention of performing it; or, [¶] 5. Any other act fitted to deceive."

Civil Code section 1573 as applicable here provides: "Constructive fraud consists: [¶] 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, . . ., [¶] 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

A "deceit" is defined by Civil Code section 1710 as either "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or [¶] 4. A promise, made without any intention of performing it."

Hobbs' holding himself out as the purchaser of the Grays' property with the intent of double escrowing it and in fact passing title to the Raffertys, making a fast profit of some $24,000 in addition to the $3,600 commission in the process, when he owed a duty to disclose the Raffertys as ready purchasers for $144,000, constituted fraudulent conduct and perpetration of a deceit.

4. *License.*

Obviously, Hobbs required a real estate license to act as a broker with regard to the sale of the Grays' property and to receive a commission. The fact that the entire deal fell through does not detract from the character of Hobbs' acts in pursuit thereof or that he needed a license therefor, or that the Grays suffered damages as a consequence of his fraudulent acts. He took advantage of his license to conduct himself in the manner he did and surely relied on it to claim a commission. (§§ 10130, 10131; *Davis* v. *Chipman* (1930) 210 Cal. 609, 616-619 [293 P. 40]; *Firpo* v. *Murphy* (1925) 72 Cal.App. 249, 254 [236 P. 968].)

## CONCLUSION

Upon their application to the Fund, the Grays presented sufficient evidence to show that they were defrauded by Hobbs acting as a licensed real estate broker in the proposed sale of their property, and that they were damaged as a result of his conduct, thus entitling them to a recovery of $5,000 from the Fund. Hobbs acted to the seller's detriment herein and no California case has held a realtor exempt from a fiduciary obligation to the seller where that occurs. (*Skopp* v. *Weaver* (1976) 16 Cal.3d 432, 440 [128 Cal.Rptr. 19, 546 P.2d 307].)

## DISPOSITION

The judgment is affirmed.

Lui, J., and Danielson, J., concurred.