[No. D001883. Fourth Dist., Div. One. Dec. 20, 1985.]

MAX H. MONTOYA et al., Plaintiffs and Appellants, v.
FRANCES McLEOD, Defendant and Respondent.

**COUNSEL**

Klitgaard & Jones and R. J. Klitgaard for Plaintiffs and Appellants.

Dean L. Lippi for Defendant and Respondent.

**OPINION**

**WORK, J.**—Max and Mary Montoya appeal a judgment denying them recovery in their constructive fraud action against Frances McLeod, a licensed real estate salesperson who solicited their unsecured loan on behalf of the investment broker by whom she was employed as an investment counselor.

Max Montoya and his wife Mary invested their life savings in a loan to be placed by Universal Financial. They received an unsecured promissory note they erroneously believed to be adequately secured by a real property deed of trust as required by law. Shortly after the loan, Universal Financial

went into receivership and the note reflecting the loan is now worth perhaps 25 cents on the dollar. Contrary to the trial court's determination, we find McLeod breached her fiduciary relationship with the Montoyas by not advising them it was illegal for Universal Financial to accept their funds in exchange for an unsecured promissory note, and in failing to take reasonable steps to learn and advise them that the actual "borrower" of the money was her broker-employer. We hold the evidence conclusively shows McLeod's conduct amounted to constructive fraud and reverse the judgment and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1980, Mr. Montoya answered Universal Financial's advertisement soliciting investments at high interest rates. He spoke with the San Diego office of Universal Financial and was given a brochure promising a secure investment based on quality *second deeds of trust*. The Montoyas made two investments of $13,000 each, and in October 1980 wished to invest $50,000. They were referred by the San Diego office to the San Bernardino office where Montoya spoke with McLeod. McLeod advised Montoya if he invested $50,000, he would receive 22 percent interest from the date Universal Financial received the funds, and the money would be placed in trust for approximately six weeks before being given to the unidentified "borrower." A deed of trust securing the loan would be sent to him. At this time, Universal Financial had no financial problems of which McLeod was aware, and Wayne Burton, the broker by whom she was employed, had a good reputation. Montoya mailed $51,286 to Universal and was given an unsecured note signed by McLeod in exchange. In March 1981, Montoya was sent a fractionalized sixth deed of trust executed by Wayne Burton (as borrower) securing undivided interests in approximately 81 loans totalling $1,300,000. Universal Financial is the beneficiary of this deed of trust and Western Sierra Finance Corporation (Burton's corporation which did business as Universal Financial) is listed as trustee.[1]

Universal Financial was placed in receivership. The value of the Universal Financial notes is uncertain, but is estimated to be approximately 25 percent of their face value. Burton faces criminal charges.

---

[1] In addition to this transactional incestuousness, the record shows Universal Financial itself was one of the 81 "secured" lenders and that Burton had executed a prior (the fifth) lien in an "undisclosed" amount the same day he executed this fractionalized sixth trust deed.

The Montoyas argue McLeod, as a real estate salesperson, violated Business and Professions Code[2] section 10231[3] and violated her fiduciary duty to disclose all material facts. McLeod claims she owed the Montoyas no fiduciary duty and caused them no damage. The trial court found (1) there was no actual misrepresentation by McLeod; (2) if in fact section 10231 was violated, this was not the proximate cause of the Montoya's loss; (3) there was probably no fiduciary duty owed Montoya by McLeod; and (4) if fiduciary duty was owed, she did not breach it because reasonable diligence on her part would not have disclosed the source or the quality of the security interest Montoya would ultimately receive.

■ When a court's finding is attacked on the ground that it is not supported by the evidence, the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding or verdict. Questions of credibility must be resolved in favor of the factfinder's determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court resolved the conflict in favor of the prevailing party. (See also *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].) We consider the record before us in the light of these rules.

*Fiduciary Duty*

■ Although the evidence markedly conflicts, McLeod's role in this transaction is best seen as that of a licensed real estate salesperson employed by Burton, a licensed real estate broker, to solicit lenders and negotiate ostensibly secured loans. In this role, her duties fell squarely under section

---

[2]All statutory references are to the Business and Professions Code unless otherwise specified.

[3]Section 10231 provides: "Except as authorized by permit issued pursuant to the provisions of Article 6 (commencing with Section 10237) or applicable provisions of the Corporate Securities Law of 1968 (Section 25000 and following of the Corporations Code), *no person* in doing any of the acts set forth in subdivision (d) of Section 10131, subdivision (e) of Section 10131, and Section 10131.1 *shall accept any* purchase or *loan funds* or other consideration *from a* prospective purchaser or *lender,* or directly or indirectly cause such funds or other consideration to be deposited in an escrow *except as to a specific loan* or a specific real property sales contract or promissory note *secured directly or collaterally by a lien on real property on which loan,* contract or note *the person has a bona fide authorization to negotiate* or to sell or which has been bought and completely paid for by the licensee, or has an unconditional written contract which obligates him to purchase a specific real property sales contract or promissory note secured directly or collaterally by a deed of trust." (Italics added.)

10131, subdivision (d) and, as such, could only be undertaken by a licensed broker or licensed salesperson employed by a broker. (§§ 10130, 10131, 10132.)[4] McLeod, however, characterizes herself as a "mere employee" and maintains her perfunctory duties for Universal Financial did not require licensure. Had McLeod simply *solicited* lenders to make loans secured by real property, she would have needed to be licensed. (§ 10131, subd. (d).) However, in her capacity as "investment counselor," she did much more. It is undisputed McLeod could communicate the terms and conditions of investments with Universal Financial to would-be lenders, accept offers, reject offers, transmit counteroffers, personally pay finder's fees, and, most importantly, execute the promissory notes underlying the various transactions. That McLeod's responsibility should be narrowed because her discretionary authority in these transactions was less than absolute is an untenable proposition. Indeed, the real estate law *requires* a broker to supervise and control the activities of a licensed salesman. (1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 4.10, pp. 21-22.) Thus, the nature of McLeod's employment does not preclude her responsibilities and duties as a licensed real estate salesperson, but, in fact, *requires* she exercise precisely those duties.

Again characterizing her duties as that of a mere employee, McLeod argues only her principal, Burton, not she, was in a fiduciary relationship with the Montoyas. McLeod again mistakes the nature of her professional responsibility. At all times she was an employee-agent of Burton, and her acts as agent were, in legal effect, his acts as principal. Thus, given McLeod's actual conduct and agency, she was indistinguishably involved in soliciting lenders and brokering loans. (Civ. Code, §§ 2295, 2304; *Gipson v. Davis Realty Co.* (1963) 215 Cal.App.2d 190, 206-207 [30 Cal.Rptr. 253].) To find otherwise would allow brokers to partition their duties so completely that no individual employee would need to be licensed nor undertake the California common and statutory law duties for real estate brokers. This would subvert the real estate law's purpose to upgrade the standards of the real estate profession and to provide protections to the consuming public. (*Rylander* v. *Karpe* (1976) 60 Cal.App.3d 317, 321 [131

[4]Section 10131 provides, in pertinent part: "A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

" . . . . . . . . . . . . . . . . . . . .

"(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity."

Section 10132 provides: "A real estate salesman within the meaning of this part is a natural person who, for a compensation or in expectation of a compensation, is employed by a licensed real estate broker to do one or more of the acts set forth in Sections 10131, 10131.1, 10131.2, 10131.3 and 10131.6."

Cal.Rptr. 415]; *Ferguson* v. *Schuenemann* (1959) 167 Cal.App.2d 413, 417 [334 P.2d 668]; 1 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 6.1, p. 176.)

McLeod similarly denies she is an agent for the Montoyas. While McLeod was paid by Burton and had no written agency agreement with the Montoyas, her conduct nonetheless established an agency relationship. (See *Vargus* v. *Ruggiero* (1961) 197 Cal.App.2d 709 [17 Cal.Rptr. 568]; *Whiteman* v. *Leonard Realty Co.* (1961) 189 Cal.App.2d 373 [11 Cal.Rptr. 211].) Here, McLeod negotiated the Montoyas' loan and executed a promissory note in their favor. Thus, much like a mortgage loan broker who becomes an agent of the borrower he or she solicits (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 782 [157 Cal.Rptr. 392, 598 P.2d 45]), McLeod, vested with some discretionary authority as an agent of a real estate broker, became an agent of would-be lenders, the Montoyas. ■ After stating that discretionary authority is *not* an essential prerequisite to the creation of an agency, the Supreme Court in *Skopp* v. *Weaver* (1976) 16 Cal.3d 432 [128 Cal.Rptr. 19, 546 P.2d 307], continued: " '[W]henever the acts or omissions of a [realtor] causes injury in a real estate transaction, there is a compelling reason' to find him an agent." (*Id.,* at p. 440, quoting in part *Hale* v. *Wolfsen* (1969) 276 Cal.App.2d 285, 290-291 [81 Cal.Rptr. 23].) ■ McLeod relies upon *Wright* v. *Lowe* (1956) 140 Cal.App.2d 891 [296 P.2d 34]; *Price* v. *Eisan* (1961) 194 Cal.App.2d 363 [15 Cal.Rptr. 202]; and *Smith* v. *Howard* (1958) 158 Cal.App.2d 343 [322 P.2d 1034], to argue she is no more than a "middleperson" in the Montoya transaction. The facts, however, belie her contention. Her duties were substantially more than administrative and her conduct was clearly more than introducing a prospective lender and real estate broker. (*Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 9 [106 Cal.Rptr. 761, 507 P.2d 65]; *Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 669 [68 Cal.Rptr. 589, 441 P.2d 101].)

■ Having determined McLeod was a licensed real estate salesperson and, in this transaction, a dual agent, we examine the conduct of her duties and responsibilities. ■ "The law imposes on a real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary.' [Citations.]" (*Batson* v. *Strehlow, supra,* 68 Cal.2d 662, 674.) In particular, "a real estate licensee is 'charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]' " (*Wyatt* v. *Union Mortgage Co., supra,* 24 Cal.3d 773, 782, quoting *Rattray* v. *Scudder* (1946) 28 Cal.2d 214, 223 [169 P.2d 371, 164 A.L.R. 1356].) This agency is fiduciary in nature and imposes high standards of good faith. (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 741 [336 P.2d 534]; *Ford* v. *Cournale* (1973) 36 Cal.App.3d 172, 180 [111 Cal.Rptr. 334, 81 A.L.R.3d 704];

*Timmsen* v. *Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, 871 [86 Cal.Rptr. 359].) Additionally, an agent is under a duty to use reasonable care, but as a professional must use a higher degree of skill and diligence in the conduct of his duties. (*Ibid.*; *Brady* v. *Carman* (1960) 179 Cal.App.2d 63, 68 [3 Cal.Rptr. 612].) Finally, real estate agents' ignorance of these duties does not excuse their malfeasance. (See *Rhoades* v. *Savage* (1963) 219 Cal.App.2d 294, 299 [32 Cal.Rptr. 885].)

■ Here, McLeod never informed the Montoyas that Burton was himself the borrower and her giving them an unsecured note in exchange for their investment was prohibited by law. (§ 10231; *Norman* v. *Dept. of Real Estate* (1979) 93 Cal.App.3d 768, 774 [155 Cal.Rptr. 715].) That McLeod was ignorant of Burton's status as borrower does not excuse her failure to make reasonable inquiry. By her own admission, she undertook more than 100 similar transactions without inquiring as to the legitimacy of potential borrowers of her clients' monies. This conduct is outrageous and, in the present case, breaches her fiduciary duty to the Montoyas. Similarly, her violation of section 10231, while affording no private right of action, further evidences McLeod's disregard of the law and her professional duties. In this transaction, McLeod profited, by her eventual commission, from a breach of her fiduciary duty to the Montoyas. On these facts, she is, at least, liable for their damage on a constructive fraud theory. (Civ. Code, § 1573; see *Gray* v. *Fox* (1984) 151 Cal.App.3d 482 [198 Cal.Rptr. 720].)

*Causation*

■ The trial court also found that violation of section 10231 was not the proximate cause of the Montoyas' injury. Again, the court was mistaken. The concept of proximate cause is applicable to injury resulting from negligence. The Montoyas' theory is not negligence but constructive fraud; that is, a fiduciary relationship, nondisclosure of a material fact, reliance and damages. The causation issue here turns on whether the Montoyas justifiably relied upon the facts presented to them, given the nondisclosure that the loan was unlawful. This question of fact must be resolved by the trial court. The matter will be remanded to the trial court to make this resolution.

*Damages*

■ Since the matter is to be remanded, it may be helpful to express our view on the damage issue. The trial court stated the amount of damages was speculative because of the uncertainty of recovery through the bankruptcy proceedings. The court heard testimony from Pat Rutherford, an expert called by McLeod, that the current fair value of the notes was 25 percent of face value. The "impreciseness" of determining actual damages here

seems no impediment to recovery. On remand the trial court should permit additional evidence based on current relevant facts relating to damages if it finds in the Montoyas' favor regarding reliance.

For the foregoing reasons, the matter is remanded to the superior court to determine whether the Montoyas justifiably relied upon the facts apparent to them, given the nondisclosure of the illegality of the transaction. If the court finds the Montoyas would not have made the $51,286 loan had all relevant facts been disclosed, the court shall determine the damages the Montoyas sustained.

Judgment reversed.

Staniforth, Acting P. J., and Butler, J., concurred.