Filed 5/17/16  Maguire v. Burns CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JANIE L. MAGUIRE et al., | D067835 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2011-00058607-CU-BC-NC) |
| MARK BURNS, | |
| Defendant; | |
| PICKFORD REALTY, LTD. | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Reversed with directions.

Business Law Group, Lowell Robert Fuselier and David J. Hart, for Plaintiffs and Appellants.

Rheinheimer Smigliani and Jane A. Rheinheimer, for Defendant and Respondent Pickford Realty.

No appearance for Defendant Mark Burns.

This case arises out of Janie and James Maguire's purchase of a vacant movie theater in Escondido, California (the City), with hopes of turning it into a dinner theater. Mark Burns, a real estate agent working under broker Pickford Realty Ltd. (Pickford), represented the Maguires in the transaction. The Maguires eventually determined the project was not feasible and sued Burns and Pickford, alleging Burns failed to adequately investigate and misadvised them regarding obstacles to develop the property. Burns did not appear in the action and the court entered default against him. After a bench trial, the court awarded the Maguires $180,619.22 in damages against Burns plus prejudgment interest. The court found the Maguires suffered the same amount of damages in regard to Pickford, but reduced the award based on principles of comparative fault and declined to award prejudgment interest. The Maguires appeal, contending the trial court erred in reducing their damages because: (1) under principles of agency and respondeat superior, Pickford was responsible for all damages caused by its agent, Burns; (2) the court's finding that Burns committed fraud entitled them to an award of prejudgment interest against Pickford; and (3) comparative fault principles do not apply. The Maguires also argue the trial court failed to address their claim that Pickford's failure to supervise Burns provided an alternative basis for a judgment against Pickford. Lastly, the Maguires contend the trial court erred by granting Pickford summary adjudication on their claim for breach of contract. We conclude that under the doctrine of respondeat superior, Pickford is liable for Burns's fraud, the resulting damages and prejudgment interest.

2

FACTUAL AND PROCEDURAL BACKGROUND

In 2007, Janie started to search for property to develop into a dinner theater. James supported the project, but did not have as much involvement in it. Janie worked as a short sale specialist for Chase Bank and, at one point, had a real estate license. However, she wanted a realtor to assist her with purchasing a property for her project because she did not have experience with commercial real estate transactions.

Janie retained an architect and engineer to assist her with evaluating properties for the dinner theater project. She also contacted Burns about her project. Burns was a real estate licensee working under broker Pickford, doing business as Prudential California Realty. Burns explained to Janie that he had extensive experience with commercial real estate transactions and had worked with redevelopment agencies.

In February 2008, Janie utilized Burns to submit an offer on the Ritz Theater, a former movie theater in the City. The building was old and in a dilapidated condition. The parties went through multiple rounds of counteroffers.

Recognizing the substantial repairs needed on the property, the sellers' agents told Burns that the seller was willing to enter into an option agreement, which would allow the Maguires to do their due diligence. Burns did not convey this information to Janie. In March 2008, while negotiations were ongoing, Burns informed the sellers' agents that he did not believe the project was risky and was acting as Janie's real estate advisor for the next two years. Burns also stated he had experience with entitlements and redevelopment agencies and would "make certain we get thru & get fully entitled." Burns had a dispute with the sellers' agents regarding payment of commissions, with

3

Burns requesting full commission at the close of escrow, despite seller financing terms over two years.

Approximately two weeks later, Burns accompanied Janie and her architect to a meeting with representatives of the City to discuss the dinner theater project. According to Janie, the City was enthusiastic about the project and encouraged her to move forward with it. Janie did not do any investigation regarding the feasibility of her dinner theater project with the City's planning, utilities, or engineering departments because she believed Burns was doing the investigation for her.

In May 2008, Burns drafted an offer for the Maguires to purchase the property for $950,000, which included $875,000 in seller financing, with a closing in 21 days. Like the Maguires' previous offer, Burns wrote the new offer on a standard California Association of Realtors Commercial Property Purchase Agreement form (Purchase Agreement). That Purchase Agreement set forth the scope of the broker's duties in the transaction. In that regard, it provided that the Maguires agreed brokers:

> "(ii) do not guarantee the condition of the Property[;] (iii) do not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) shall not be responsible for identifying defects that are not known to Broker(s); (v) shall not be responsible for inspecting public records or permits concerning the title or use of the Property; . . . and (ix) shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals."

The Maguires also agreed to a Buyer's Inspection Advisory, which provided:

> "Brokers do not have expertise in all areas and therefore cannot advise you on many items, such as . . . the condition of roof, plumbing, heating, air conditioning, electrical, sewer, septic, waste disposal, or other systems.  The only way to accurately determine the condition of the Property is through an inspection by an appropriate professional selected by you. . . .  YOU ARE STRONGLY ADVICED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY.  IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS."

When Burns provided the Purchase Agreement to Janie for approval, they had a discussion concerning Burns's investigation of the property with the City.  Burns stated that he had not found anything detrimental to the project and "everything was a go."  The sellers accepted Janie's offer in late May 2008.

In June 2008, the sellers sent the Maguires a letter stating they were willing to cancel or restructure the deal because they believed the Maguires were "uninformed buyer[s]" and did not understand obstacles to redeveloping the property.  The sellers also stated they believed the property was worth only between $600,000 and $750,000.  Prior to the close of escrow, the Maguires met with the sellers to discuss the sellers' concerns.  The sellers stated the Maguires were paying too much for the property and Burns was not representing the Maguires well.  The Maguires did not contact anyone at Pickford regarding the sellers' concerns.  The escrow for the property closed in late June 2008.

In October 2010, Janie submitted a plan to the City for development of the dinner theater project.  Thereafter, the City informed Janie that her project was not feasible as proposed because the City's waterline infrastructure was not sufficient to serve the needs

5

of the development.  The Maguires eventually concluded the infrastructure issues were too big of a hurdle for them and deeded the property back to the sellers.

The Maguires incurred costs in connection with their ownership of the property, including interest, taxes, utilities, and development costs, totaling $180,619.22.  They sued Burns and Pickford to recover these costs, alleging causes of action for breach of oral contract, negligence, breach of fiduciary duty, and fraud.  The Maguires asserted that Pickford and Burns failed to disclose the opportunity for an option agreement, allowed escrow to close without recommending that the purchase be contingent on development approvals from the City, and failed to conduct an adequate investigation to determine if the property was feasible for its intended use.

The trial court granted Pickford summary adjudication on the Maguires' breach of oral contract claim.  After a bench trial on the remaining causes of action, the trial court found Burns was negligent in his representation of the Maguires and breached his fiduciary duties to them.  The court also found that Burns, but not Pickford, committed fraud "in asserting his knowledge of the development potential of the property, inspecting public records and interacting with public officials, determining the quality of public utilities representing himself as having knowledge and skills that exceed that generally required to perform real estate activity."  The court awarded the Maguires $180,619.22 in damages against Burns plus prejudgment interest.  The court found the Maguires suffered the same amount of damages in regard to Pickford, but reduced the award based on principles of comparative fault and declined to award prejudgment interest.

6

DISCUSSION

I. *Agency and Respondeat Superior Liability*

The Maguires argue the trial court erred in finding Pickford was not liable for all damages caused by Burns. Specifically, they assert that under principles of agency and respondeat superior, Pickford was responsible for Burns's fraudulent acts and their resulting damages. We agree.

Under the respondeat superior doctrine, a principal is vicariously liable for the conduct of its agent or employee acting within the scope of the agency relationship. (*Otis Elevator Co. v. First Nat. Bank of San Francisco* (1912) 163 Cal. 31, 39; Civ. Code, § 2338.) The plaintiff has the burden of proving that the agent's tortious act was committed within the scope of his employment. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 209.) Ordinarily this is a question of fact, but it becomes one of law "when the facts are undisputed and no conflicting inferences are possible." (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968.)

" ' "[W]here the question is one of vicarious liability, the inquiry [with respect to the question whether an employee was acting within the scope of his employment] should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer." ' " (*Farmers Insurance Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003 (*Farmers*), citations and italics omitted.) "Categorization of an employee's action as within or outside the scope of employment . . . begins with a question of foreseeability." (*Lazar v. Thermal Equipment Corp.* (1983) 148 Cal.App.3d 458, 464 (*Lazar*).) " ' "[F]oreseeability" as a test for

7

respondeat superior merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' " (*Farmers*, at p. 1004, italics omitted.)

"In California, the scope of employment has been interpreted broadly under the respondeat superior doctrine." (*Farmers*, *supra*, 11 Cal.4th at p. 1004.) "An employer may therefore be vicariously liable for the employee's tort—even if it was malicious, willful, or criminal—if the employee's act was an 'outgrowth' of his employment, ' " 'inherent in the working environment,' " ' ' " 'typical of or broadly incidental to' " ' the employer's business, or, in a general way, foreseeable from his duties. [Citation.] By contrast, an employer will *not* be held liable under the respondeat superior doctrine for conduct that occurs when the employee 'substantially deviates from the employment duties for personal purposes' or acts out of personal malice unconnected with the employment, or where the conduct is ' "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." ' " (*Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, 482.)

Here, there is no dispute that Burns was acting as Pickford's agent when he represented the Maguires. The trial court found that Burns committed fraud upon the Maguires in asserting his knowledge of the property's development potential, inspecting public records and interacting with public officials, determining the quality of public utilities, and representing himself as having knowledge and skills exceeding those generally required to perform licensed real estate activity. The court concluded Pickford

8

was not responsible for Burns's fraud.  In reaching this conclusion, the trial court relied in part on its finding that "[t]here was no evidence that [the Maguires'] and Burns'[s] decision to go beyond the [Purchase Agreement's] exclusions [concerning the scope of a broker's duties] was ever conveyed to Pickford."  However, this is not the proper test for determining respondeat superior liability.  Rather, the appropriate inquiry is whether Burns was acting within the scope of his employment, which requires a determination of forseeability.

Under the proper test, the evidence established Burns's wrongful conduct was foreseeable and an outgrowth of and incidental to Pickford's real estate business.  The evidence showed that Burns's statements regarding the property's development potential and that "everything was a go" with the City were part and parcel of his representation of the Maguires in their purchase of the property.  Burns marketed himself to Janie by telling her that he had extensive experience with commercial real estate transactions and had worked with redevelopment agencies.  Further, while negotiations regarding the theater property were ongoing, Burns accompanied Janie to a meeting with City representatives to discuss the dinner theater project.  Pickford's own expert conceded that if an agent agrees to engage in an investigation of a property to determine if it would work for a particular project, that investigation "may be" within the scope of a real estate agent's licensed activity.  Thus, Burn's activities were reasonably foreseeable. Even if Burns's misrepresentations were for personal purposes, "where the servant is combining his own business with that of his master, or attending to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged

9

in when a third person was injured." (*Lazar*, *supra*, 148 Cal.App.3d at pp. 466-467.) Based on the foregoing, we conclude Burns was acting within the scope of his employment when he committed fraud.

Like the trial court, Pickford relies on the exclusions in the Purchase Agreement and Buyer's Inspection Advisory regarding the scope of a broker's duties to assert that it should not be responsible for Burns's fraud because the Maguires were aware of limitations on Burns's work. In that regard, Pickford points to Civil Code section 2318, which states: "[e]very agent has actually such authority as is defined by [Title 9 of the Civil Code pertaining to agency], unless specially deprived thereof by his principal, and has even then such authority ostensibly, *except as to persons who have actual or constructive notice of the restriction upon his authority*." (Italics added; undesignated statutory references are to this code.) Pickford's reliance on section 2318 is unavailing.

Although the Purchase Agreement and Buyer's Inspection Advisory set forth the scope of a broker's duties generally, nothing in those documents prevented Burns from voluntarily assuming those responsibilities. The experts in this case agreed that although a broker is not obligated to conduct a due diligence investigation for his client, he can assume that responsibility and, if he does so, such an investigation would fall within the scope of a real estate license. Accordingly, despite their knowledge of the limitations on a broker's duties set forth in the Purchase Agreement and Buyer's Inspection Advisory, the Maguires could rely on Burns's apparent authority to perform investigatory duties for them. As the principal, Pickford was responsible for Burns's wrongful conduct stemming from the agency.

10

At oral argument, Pickford argued that a principal is not liable for actions undertaken by its agent before the buyer and seller to a real estate transaction enter into a purchase and sale agreement and open escrow. Pickford did not offer any authority to support this proposition. Regardless, we need not address this argument, as it was made for the first time at oral argument. (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 854 ["We will not consider an issue not mentioned in the briefs and raised for the first time at oral argument."].) Further, we would reject the argument because even before the Purchase Agreement, Burns, as an agent for Pickford, engaged in extensive negotiations and submitted multiple offers to purchase the dinner theater property on behalf of the Maguires. As required by his independent contractor agreement with Pickford, Burns conducted this licensed activity in the name of Pickford and the Maguires' offer to purchase confirmed the agency relationship. Thus, Pickford can be held liable for Burns's conduct before the Purchase Agreement that was foreseeable and incidental to Pickford's business.

Based on the foregoing, we conclude Pickford was liable for the full amount of damages caused by Burns's fraud upon the Maguires.

## II. *Comparative Fault*

The Maguires argue the trial court erred in applying comparative fault principles to reduce their damages because that doctrine does not apply to fraud. We agree.

Comparative fault is not a defense to a claim for fraud. (*Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 176.) In *Carroll v. Gava* (1979) 98 Cal.App.3d 892, a property buyer sued the seller alleging the seller misrepresented that the property was

11

zoned for mobile home use. (*Id.* at p. 894.) The seller argued comparative negligence should defeat the damage award in favor of plaintiff. (*Id.* at p. 895.) In rejecting this argument, the court reasoned: "the concept has no place in the context of ordinary business transactions. . . . This straightforward approach provides an essential predictability to parties in the multitude of everyday exchanges; application of comparative fault principles, designed to mitigate the often catastrophic consequences of personal injury, would only create unnecessary confusion and complexity in such transactions." (*Id.* at pp. 896-897.)

Here, Pickford does not dispute the proposition that comparative fault principles do not apply to fraud. Instead, it argues that the trial court correctly applied comparative fault because it found Pickford was liable only for Burns's negligence, not his fraud. As we explained, Pickford is liable for Burns's fraud under the doctrine of respondeat superior. Accordingly, comparative fault does not apply to reduce the Maguires' damages resulting from fraud upon them.

### III. *Prejudgment Interest*

The Maguires argue the trial court erred by declining to award them any prejudgment interest as against Pickford. We agree.

Under section 3288, "in every cause of oppression, fraud, or malice, interest may be given, in the discretion of the [trier of fact]." "[S]ection 3287, subdivision (a) provides that a party is entitled to recover prejudgment interest on an amount awarded as damages from the date that the amount was both (1) due and owing and (2) certain or capable of being made certain by calculation. . . . [¶] Damages are certain or capable of being made

12

certain by calculation, or ascertainable, for purposes of . . . section 3287, subdivision (a) if the defendant actually knows the amount of damages or could compute that amount from information reasonably available to the defendant. . . . In contrast, damages that must be judicially determined based on conflicting evidence are not ascertainable. [Citations.] A legal dispute concerning the defendant's liability or uncertainty concerning the measure of damages does not render damages unascertainable. [Citations.] On appeal, we independently determine whether damages are ascertainable for purposes of the statute." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 919.)

Here, the trial court declined to award prejudgment interest pursuant to section 3288. The court also determined that prejudgment interest "[was] not recoverable under . . . [section] 3287 [subdivision] (a) since damages were not certain as to Defendant Pickford until the Court apportioned fault." Assuming without deciding that the trial court acted within its discretion in not awarding prejudgment interest under section 3288, we consider whether the court properly concluded prejudgment interest was not recoverable under section 3287, subdivision (a).

As we explained, comparative fault does not apply in this case because Pickford is responsible for Burns's fraud under the doctrine of respondeat superior. Given that the trial court calculated and awarded the Maguires prejudgment interest against Burns in the amount of $70,196.02, the amount was clearly ascertainable. Thus, the Maguires were entitled to recover the same prejudgment interest from Pickford on the damages resulting from Burns's fraud.

13

IV. *Failure to Supervise Claim*

The Maguires argue Pickford's failure to supervise Burns provided an alternative and independent basis to award the full amount of damages against Pickford. Pickford claims the Maguires waived the issue on appeal by failing to object to the trial court's statement of decision on that issue. Having concluded that Pickford is liable for the full amount of damages resulting from Burns's fraud, we need not address the failure to supervise claim.

V. *Breach of Contract*

A. Additional Background

The Maguires asserted a breach of contract cause of action, claiming they had an oral contract with Burns in which he agreed to act as their agent in the purchase of the property, conduct an investigation with the City regarding the feasibility of the project, and draft a purchase agreement which protected the Maguires' interests. The trial court granted Pickford summary adjudication on the Maguires' breach of oral contract claim.

B. Analysis

The Maguires argue the trial court erred by granting Pickford summary adjudication on their claim for breach of contract. They contend, however, that the argument is moot "[i]f the trial court is reversed with respect to the award of all compensatory damages as against [Pickford]." Having concluded that Pickford is liable for all damages arising from Burns's fraud, we accept the Maguires' concession that their breach of contract argument is moot.

14

DISPOSITION

The judgment is reversed and the trial court is directed to enter a new judgment against Pickford awarding the Maguires $180,619.22 in compensatory damages plus prejudgment interest to the date of the new judgment. The Maguires are entitled to their costs on appeal.

McINTYRE, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.

15